

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

NORFOLK DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 2:19cr 171 |
| | ) | |
| ROBERT JAMES McCABE | ) | 18 U.S.C. § 1349 |
| (Counts 1-11) | ) | Conspiracy to Commit Honest Services |
| and | ) | Mail Fraud |
| | ) | (Counts 1-2) |
| GERARD FRANCIS BOYLE, | ) | |
| (Counts 2, 5-7, 9, 11) | ) | 18 U.S.C. §§ 1341, 2 |
| Defendants. | ) | Honest Services Mail Fraud |
| | ) | (Counts 3-7) |
| | ) | |
| | ) | 18 U.S.C. § 1951 |
| | ) | Conspiracy to Obtain Property Under |
| | ) | Color of Official Right |
| | ) | (Counts 8-9) |
| | ) | |
| | ) | 18 U.S.C. § 1951 |
| | ) | Obtaining Property Under |
| | ) | Color of Official Right |
| | ) | (Count 10) |
| | ) | |
| | ) | 18 U.S.C. § 1956(h) |
| | ) | Conspiracy to Commit Money Laundering |
| | ) | (Count 11) |
| | ) | |
| | ) | 18 U.S.C. §§ 981, 982 |
| | ) | Criminal Forfeiture |

## INDICTMENT

October 2019 Term – at Norfolk, Virginia

THE GRAND JURY CHARGES THAT:

At all times relevant to this Indictment, unless otherwise stated:

## GENERAL ALLEGATIONS

### A.    The Defendants

1.     In or about 1993, the citizens in the City of Norfolk first elected defendant ROBERT JAMES McCABE ("McCABE") to serve as the Sheriff of Norfolk.  From in or about 1994 through in or about 2017, McCABE served as the Sheriff of Norfolk.  In 2016, McCABE was a candidate for Mayor of the City of Norfolk.  McCABE lost that election but continued to serve as the Sheriff until he resigned effective February 1, 2017.  McCABE lived in the City of Norfolk.

2.     As the Sheriff of the City of Norfolk, McCABE was a constitutional officer in the Commonwealth of Virginia who performed a wide range of official actions.  Under Virginia law, the Sheriff was charged with the custody, feeding, and care of all prisoners confined in the Norfolk City Jail.  As a result, McCABE exercised vast discretion over public contracts providing for, among other things, the medical services and food services to inmates residing in the jail.

3.     The Norfolk City Jail was located on East City Hall Avenue in Norfolk, Virginia.

4.     Conspirator #1 was the Chief Executive Officer of Company A, a Louisiana-based company that provided food services management to the Norfolk City Jail.

5.     GERARD FRANCIS BOYLE ("BOYLE") was the founder and Chief Executive Officer of Correct Care Solutions ("CCS").  Since 2004, the Norfolk Sheriff's Office has contracted with CCS to provide medical services to the inmates at the Norfolk City Jail.  BOYLE resided in Nashville, Tennessee.

6.     Conspirator #2 was a local real estate developer with business interests in the City of Norfolk.

**B.     The Illicit Bribery Schemes**

7.     As set forth below, from in or about 1994 through in or about December 2016, defendants McCABE, BOYLE, Conspirator #1, Conspirator #2, and others both known and unknown to the grand jury engaged in unlawful bribery schemes.  In these schemes, McCABE used his official position as the Norfolk Sheriff to enrich himself by soliciting things of value including. but not limited to, gifts, food, cash, travel, entertainment, campaign contributions, in-kind political donations, and other things of value from Conspirator #1, BOYLE, and other individuals with interests connected to the Norfolk Sheriff's office and the City of Norfolk.  In exchange for these items, McCABE agreed to perform and performed official actions, including certain specific official actions and other official actions on an as-needed basis to benefit BOYLE, Conspirator #1, and others.

**C.     McCABE's *Quid Pro Quo* Relationship with Conspirator #1**

8.     In or about 1994, Company A received a one-year emergency food services contract for the Norfolk City Jail.

9.     Shortly before Company A's one-year emergency contract was set to expire, the City of Norfolk issued a Request for Proposal ("RFP") to solicit bids from potential food services vendors.  Company A submitted a proposal to obtain this contract.

10.     After submitting the proposal, Conspirator #1 contacted McCABE to inquire about his bid, and McCABE invited him to come to McCABE's office.  Once there, McCABE told Conspirator #1 that he was going to excuse himself from his own office and instructed Conspirator #1 to look at something on his desk.  After giving this instruction, McCABE left the room, and

Conspirator #1 looked on McCABE's desk and saw a competitor's bid proposal. Conspirator #1 used this information to submit an updated bid proposal that undercut his competitor's bid. Company A won the food services contract.

11.     On or about July 1, 1995, McCABE, as the Sheriff of Norfolk, signed a contract with Company A to provide food services for the inmates at the Norfolk City Jail. The contract was for a term of one year and gave the Sheriff the option to renew the contract for two additional years. The value of the contract was approximately $1,303,050 per year.

12.     In furtherance of the conspiracy, as the conspirators were aware, Company A submitted invoices via the United States Mail, and the City of Norfolk sent monthly payments arising from the food services contract to Company A via the United States Mail.

13.     After McCABE disclosed confidential bid information to Conspirator #1, the conspirators established an illegal *quid pro quo* relationship. From in or about 1994 through in or about December 2016, McCABE requested and received free catering, travel, campaign contributions, entertainment, gift cards, and personal gifts from Conspirator #1 and, in exchange, McCABE performed specific official acts and acts on an as-needed basis related to Company A's food services contract with the Norfolk Sheriff's Office. Such official acts included, but were not limited to, granting extensions to Company A's food services contract without putting the contract out to bid, providing inside information to Company A related to RFPs, and providing Cost of Living ("COLA") adjustments that had the effect of increasing payments to Company A.

14.     Throughout the course of the conspiracy, upon McCABE's request, Conspirator #1, acting through Company A, regularly provided free catering for McCABE's annual golf tournament, personal Christmas parties, and an annual "Big Blue BBQ" at Old Dominion

University, and also provided food for the Norfolk Sheriff's Office. Some of the costs associated with these events totaled over $2,000.

15. Throughout the course of the conspiracy, McCABE regularly requested from Conspirator #1 and received hundreds of dollars in gift cards to restaurants and stores such as the Village Butcher and Todd Jurich's Bistro.

16. Throughout the course of the conspiracy. at McCABE's request and in furtherance of the scheme, Conspirator #1 provided substantial campaign contributions to McCABE. Conspirator #1 understood that McCABE would not use and continue to use Company A for food services at the Norfolk City Jail if Conspirator #1 did not provide such personal benefits.

**D.** **McCabe's *Quid Pro Quo* Relationship With Boyle**

17. Starting in or about January 2004 through in or about December 2016, McCABE and BOYLE engaged in a transactional relationship and a knowing course of conduct during which BOYLE agreed to give gifts and things of value to McCABE and, in exchange for which, McCABE agreed to exercise his official authority to take actions that were favorable to BOYLE's company in connection with its medical services contract. During the course of this conspiracy, McCABE solicited and/or accepted many things of value including, but not limited to. cash, a loan, entertainment – including attendance at the Richard Petty Driving Experience and concerts – as well as travel-related expenses, campaign contributions, undisclosed in-kind political donations such as all-expense paid trips to Nashville. "McCABE for Mayor" cigars, autographed guitars, a TAGHeuer watch, gift cards, and other personal gifts from BOYLE. In exchange. McCABE performed specific official acts and official acts on an as-needed basis related to CCS's medical services contract with the Norfolk Sheriff's Office. Such official acts included, but were not limited to, providing inside information to CCS's representatives during confidential bidding

processes; ensuring that CCS was selected as the medical services provider; granting extensions to CCS's medical services contract without putting the contract out to bid; providing inside information to CCS regarding RFPs; awarding staffing cost adjustments to CCS increasing the value of their contract; reducing CCS's obligations to provide prescription drugs to certain inmates upon their release; and providing consumer price index ("CPI"), otherwise known as "COLA" adjustments.

18.     On or about August 26, 2003, BOYLE established CCS to provide medical services to prisons and local jails.  Prior to establishing CCS, BOYLE worked for a competing company that held the medical contract with the Norfolk Sheriff's Office to provide medical services at the Norfolk City Jail.

19.     In or about January 2004, McCABE, BOYLE, and others attended a conference in New Orleans, Louisiana.  At the conference, the parties discussed the Norfolk Sheriff's Office upcoming RFP for the medical services contract at the Norfolk City Jail.  While at this conference, BOYLE and another CCS employee paid for "entertainment expenses" for McCABE.

20.     On or about March 16, 2004, as the parties had discussed, Norfolk issued an RFP to companies seeking to provide comprehensive medical. dental, and mental health services for the inmates of the Norfolk City Jail.  The RFP contained a provision that stated that "[q]uestions should be addressed to the Purchasing Agent" and warned that "[d]iscussions with other City employees or officials during the solicitation and evaluation period are inappropriate."

21.     On or about March 30, 2004, the City of Norfolk hosted a meeting for companies interested in bidding on the RFP that included a tour of the Norfolk City Jail.  BOYLE attended the bid meeting.

22.     Prior to the bid meeting and despite the warning contained in the RFP, McCABE invited BOYLE to a private meeting in McCABE's office. After attending this private meeting, BOYLE left McCABE's office and walked into the bid meeting by himself while McCABE exited his office through a different door. A short time later, McCABE entered the bid meeting and introduced himself to BOYLE in front of the other company representatives to make it appear as though they had not just come from a private meeting.

23.     In or about April 2004, while the RFP was pending and despite the warning contained in the RFP, BOYLE and another CCS employee hosted a dinner for McCABE and another Norfolk Sheriff's Office employee. After the dinner, McCABE directed a Norfolk Sheriff's Office employee to provide inside information – not provided to other bidders – to BOYLE and the other CCS employee.

24.     On or about May 5, 2004, while the RFP was pending, BOYLE and another CCS employee traveled to Norfolk to discuss their proposal for the medical services contract. McCABE hosted the meeting involving BOYLE, the CCS employee, and other Norfolk Sheriff's Office employees at his home. At one point, McCABE and BOYLE told all of the other individuals present to leave the room so that they could negotiate the deal. After the private negotiations were finished, McCABE, BOYLE, and the other meeting attendees went to Greenies, a bar in Norfolk, to celebrate. The next day, at BOYLE's direction, a CCS employee sent a letter revising CCS's proposal and documenting the deal struck the previous day at McCABE's home.

25.     Less than a week later, on May 12, 2004, McCABE, as the Norfolk Sheriff, sent a letter to the Purchasing Agent for the City of Norfolk stating: "I have approved the recommendation of my medical RFP review committee to award an Agreement to Correct Care Solutions, LLC to provide medical services for our inmates…."

7

26.     On or about May 19, 2004, BOYLE hosted a dinner for McCABE and other Norfolk Sheriff's Office employees.   After the dinner, McCABE and another Sheriff's Office employee flew to Nashville, Tennessee, to visit CCS's headquarters.   While they were there, BOYLE arranged for McCABE and the employee to attend a Brooks & Dunn concert in Nashville at the home of recording artist Ronnie Dunn.

27.     A month later, on or about June 15, 2004, McCABE, as the Sheriff of Norfolk, signed an agreement with CCS to provide medical services for the Norfolk City Jail. The Sheriff agreed to pay $3,119,863 to CCS for the first year of the contract, and $3,244,658 to CCS for the second year of the contract.   The agreement also stated that McCABE had the discretion to grant CCS an extension to provide medical services for the Norfolk City Jail for a third year and agreed to pay $3,374,444 to CCS for that year if the extension was granted.   According to the contract, after the third year extension, "[p]ricing for any subsequent years of the contract shall be negotiated prior to the beginning date of the extended contract term."   This provision gave McCABE the authority and discretion to grant annual extensions to CCS without putting the medical services contract back out for bid.

28.     In furtherance of the conspiracy, as the conspirators were aware, CCS submitted invoices via the United States Mail, and the City of Norfolk sent monthly payments arising from the contract to CCS via the United States Mail.

29.     Four months after signing this contract, BOYLE directed a CCS employee to purchase tickets for McCABE and another Norfolk Sheriff's Office employee to attend an NFL football game between the Washington Redskins and the Green Bay Packers.   The seats were located on the 50 yard line and cost over $600.

30.    In or about May 2006, BOYLE arranged for McCABE to attend a concert and to stand backstage.  BOYLE sent an email to a CCS investor that stated: "I talked with the Sheriff and he had a great time last night.  He was allowed to stand back stage and met with Ronnie briefly.  He was truly grateful and said the tour manager was a great guy who treated him like royalty … I know it must get old having to call for favors but I think you know the importance of this one … Thanks again."

31.    After CCS completed the second year of its contract, from 2006 through 2010, McCABE, as Sheriff of Norfolk, repeatedly exercised his discretion to extend CCS's medical services contract for an additional year without opening the contract up for bid.  As a result, CCS continued to provide medical services to the Norfolk City Jail for five additional years without competing for the contract.

32.    Throughout the conspiracy, BOYLE was aware that he had to provide these things of value – including campaign contributions and in-kind political donations – to McCABE to maintain the medical services contract.  McCABE sought campaign contributions and in-kind political donations from BOYLE including during years in which McCABE was not running for office.  In or about October 2008, BOYLE sent an email to two investors connected with CCS with the subject line "McCabe."  In the email, BOYLE stated:

> When you get a chance I would appreciate a check to "re-elect Robert McCabe Sheriff."  Because you are miracle workers the Sheriff has also stated that "it would be cool if [Ronnie Dunn or Alan Jackson] could write a check supporting my campaign".  Celebrity is everything for some people I guess.  That was his request and our contract is out to bid in January for a July renewal.  Let me know your thoughts and don't kill the messenger.

33.    On or about October 9, 2008, McCABE sent BOYLE and another individual an email thanking BOYLE for the campaign contributions and referring to BOYLE as his "southeast campaign chairman."

34.     At various times throughout the conspiracy, McCABE served as a reference for BOYLE. In or about April 2009, McCABE sent BOYLE a picture of McCABE wearing a CCS shirt and referring to himself as "your Mid-Atlantic CCS rep."

35.     At various times throughout the conspiracy, McCABE wrote campaign checks made payable to Sheriff's Office deputies and directed them to cash the checks and return the funds to him – or to his friend – for personal use. To conceal his personal use of campaign funds, McCABE knowingly lied on his campaign filings.

36.     On or about January 29, 2009, legal counsel for the Norfolk Sheriff's Office emailed a draft RFP for the rebid of the jail's medical services contract to McCABE and other employees for review and comments. McCABE forwarded the attorney's email containing the draft RFP through two private email accounts and then to BOYLE.

37.     On or about May 10, 2009, McCABE sent BOYLE an email that stated: "[GM] who bid on the Nashville trip last year asked me last night if I was doing another one – he would spend at least 2K on auction items. Don't know if it's too late to do something like that but I am going to scrounge around and maybe do a couple of items from my gameroom. Look forward to seeing you up here – can't thank you enough for everything you have done!!" BOYLE responded by directing his secretary "please send [D] the following info 2 roundtrip tickets Nashville 30 days notice 2 nights @ opryland hotel 2 tickets Saturday night grand old opry compliments of CCS." McCABE never disclosed this in-kind donation on his campaign reports.

38.     On or about June 8, 2009, McCABE signed a one-year extension of CCS's contract to provide medical care for the Norfolk City Jail.

39.     On or about May 21, 2010, the City of Norfolk issued an RFP for a new medical contract for the Norfolk Sheriff's Office. Like the 2004 RFP, the 2010 RFP contained a provision

stating that "[q]uestions should be addressed to the Purchasing Agent" and warning that "[d]iscussions with other City employees or officials during the solicitation period are inappropriate."

40.     On or about August 17, 2010, in response to the RFP, CCS submitted its "best and final offer" to the City of Norfolk.  CCS was not the lowest bidder.  Although members of the selection committee were prohibited from discussing the matter with McCABE, a member of the committee who worked for McCABE disclosed to him that CCS's bid was not the lowest.  In fact, a competitor's best and final offer was approximately $185,000 lower per year than CCS's best and final offer.  In response, McCABE told this employee that he should contact a certain CCS representative and provide confidential bid information, but the employee refused to do so.  The selection committee did not award the contract based on the best and final offers.  Instead, on or about October 25, 2010, the Norfolk Purchasing Agent sent an email to all bidders directing them to prepare a second best and final offer and respond within four days.

41.     On or about October 29, 2010, BOYLE submitted CCS's second best and final offer, which dropped CCS's price by $205,000 and provided a false justification for the reduction. After that reduction, CCS was the lowest bidder by approximately $16,000.  Five days later, McCABE informed the Purchasing Agent that CCS was "determined to be the most advantageous" bid for the City.  Over the course of the following year, BOYLE provided numerous things of value including, but not limited to, a cash loan, campaign contributions, and cash payments directly to McCABE.

42.     On or about October 14, 2011, a CCS employee sent BOYLE an email stating: "Any update on a mccabe getaway?  I ask because accounting has accrued $35k for staffing give

backs....If we can get an agreement to include malpractice or some other costs into the equation we could get this as a pickup."

43.     After receiving this email, on or about October 22, 2011, BOYLE met McCABE in a hotel lobby in Philadelphia, Pennsylvania. McCABE asked BOYLE to lend him money. BOYLE gave $6,000 in cash to McCABE. BOYLE and McCABE agreed that McCABE would not have to repay this loan until McCABE retired. BOYLE and McCABE did not sign any paperwork documenting this loan and McCABE never made any payments on this loan. McCABE concealed this loan by failing to disclose it on his required Statement of Economic Interests Forms. As such, the citizens of Norfolk were never aware that their Sheriff was indebted to BOYLE.

44.     Three days later, on or about October 25, 2011, a CCS employee made an airline reservation for McCABE to travel from Nashville, Tennessee to Phoenix, Arizona on Tuesday, November 1, 2011.

45.     On or about Monday, October 31, 2011, McCABE flew to Nashville, Tennessee. The next day, BOYLE and McCABE flew together from Nashville, Tennessee to Phoenix, Arizona. BOYLE and McCABE spent three days together in Arizona with McCABE traveling back to Norfolk on Thursday, November 3, 2011. During that time, BOYLE and McCABE went to the Casino Arizona at the Talking Stick Resort. Sometime during the trip, BOYLE gave McCABE thousands of dollars in cash to use at the casino.

46.     Later in the conspiracy, McCABE decided to run for Mayor of the City of Norfolk. In or about July 2015, a CCS employee sent a text to BOYLE stating that he "[h]eard McCABE announced he will run for mayor....Maybe an opening for our CPI [consumer price index] discussion." The employee then sent a text message to McCABE stating: "[b]est of luck with

Mayor run, let us know how we can assist although we'll miss you at Sheriff Office. Remember us little people."

47.     On or about August 12, 2015, at BOYLE's request, McCABE approved a 3% COLA to the CCS medical contract and made it retroactive to December 15, 2014. This raised the annual contract amount to approximately $3,861,054.50.

48.     On or about April 15, 2016, BOYLE attended McCABE's annual golf tournament. During the tournament, BOYLE wrote a personal check for $12,500, left the "Pay to the order of" line blank, wrote "Consulting" in the memo line, and gave the check to McCABE. BOYLE knew that this check had nothing to do with "consulting" and used that term to mask its purpose. Later that day, BOYLE sent an email to a CCS employee: "at the airport ... Sheriff McCabe is in a good place with us."

49.     After receiving the check from BOYLE, McCABE gave the check to Conspirator #2 and instructed Conspirator #2 to write his name in the "Pay to the order of" line and deposit the funds into Conspirator #2's checking account. Conspirator #2 also had previously provided McCABE with substantial campaign contributions and other personal benefits.

50.     After Conspirator #2 received the check, Conspirator #2 approached three friends, asked them to make campaign contributions to the "McCABE for Mayor" campaign, and promised to reimburse them for their contributions. In total, at the request of Conspirator #2, the three friends donated $6,000 to the "McCABE for Mayor" campaign.

51.     After receiving BOYLE's check, Conspirator #2 made two campaign contributions to the "McCABE for Mayor" campaign  – one for $1,500 and another for $2,500 – through two of Conspirator #2's companies.

52.     On or about April 25, 2016, Conspirator #2 deposited the $12,500 check into Conspirator #2's personal checking account at Heritage Bank.

53.     Conspirator #2 then reimbursed all three friends for their "McCABE for Mayor" campaign contributions for a total of $6,000.

54.     Conspirator #2 then reimbursed one of Conspirator #2's companies for its $1,500 campaign contribution.

55.     McCABE's campaign finance disclosure forms do not reflect BOYLE's April 2016 campaign contribution to McCABE.

56.     On or about May 3, 2016, McCABE lost the election for Mayor, but remained the Sheriff of Norfolk.

57.     Approximately one month later, Conspirator #2 attempted to discuss the BOYLE check with McCABE.  In response, McCABE asked "what check"?  McCABE then acted as though he did not recall BOYLE's $12,500 check.  Conspirator #2 told McCABE that if anyone ever asked about the check, he (Conspirator #2) would not lie for anyone.  McCABE subsequently acknowledged the check and stated that if it ever became a problem he would "man up."

58.     In or about November 2016, after the publication of a Virginian-Pilot article about McCABE, BOYLE contacted Conspirator #2.  BOYLE told Conspirator #2 that he hoped the $12,500 check was not going to be a problem.  In response, Conspirator #2 told BOYLE that he was not going to lie to anyone if asked about the check.  After receiving the call from BOYLE, Conspirator #2 contacted McCABE again to discuss the $12,500 check.  In response, McCABE again replied that he would take care of it and "man up" if the $12,500 check became a problem.

59.     On or about November 14, 2016, McCABE sent a text message to a CCS employee. McCABE wrote, "[g]ot your email Hope all is well btw – we just sent over RFP to the city for

14

Norfolk medical contract. They work slow but hopefully get it out before end of year!" The CCS employee replied: "Thank you. I assume you know I am being brief intentionally on the emails…" McCABE responded: "I am too or at least trying. Gonna have a second phone this week with the re-election coming up next year. I will share when I get it."

### E.     Defendants' Efforts to Conceal the Scheme

60.     Under Virginia law, certain government officials, including the Norfolk Sheriff, are required to file an annual standardized disclosure statement of their personal economic interests. The disclosure statement is commonly referred to as the Statement of Economic Interests ("SOEI"), and it is legally required to be filed and maintained as a public record for five years. Among other things, the SOEI requires a government official to disclose gifts or entertainment valued in excess of $50 received by the government official from any business or individual (other than a relative or close personal friend), and to list the name of the business or individual and the approximate value of the gift or entertainment. Since 2014, the SOEI also required McCABE to disclose and identify any unsecured loans in excess of $5,000 to any one creditor. Pursuant to Virginia law, the government official must swear or affirm that the information provided on the SOEI is full, true, and correct to the best of the official's knowledge.

61.     From in or about 2011 through 2016, McCABE filed his SOEI on an annual basis. On each SOEI, McCABE failed to disclose numerous things of value that he received from BOYLE, Conspirator #1, and others known to the grand jury. McCABE also failed to identify BOYLE as a creditor on a $6,000 no document, no interest, no payment, unsecured cash loan.

62.     Pursuant to Virginia statutes regulating elections and campaign finances, McCABE was required, as both a candidate for re-election as Norfolk Sherriff and as a candidate for Norfolk

Mayor, to file accurate campaign finance disclosure reports specifically identifying all campaign contributions and expenditures.

63.    McCABE filed campaign finance disclosure reports and other required reports from 2010 through 2016. Among other things, those reports from 2010 through 2016:

   a. failed to identify CCS's in-kind donations of all-expense-paid trips to Nashville and other silent auction items;

   b. failed to disclose BOYLE as the true source of a $12,500 campaign contribution;

   c. failed to identify gifts and in-kind political donations from BOYLE and Conspirator #1;

   d. failed to disclose personal purchases made by McCABE out of the campaign account;

   e. misrepresented other personal expenses as legitimate campaign expenses; and

   f. falsely claimed that he had "loaned" his campaign money to justify the movement of funds from his campaign account to his personal account.

## COUNT ONE
### (Conspiracy to Commit Honest Services Mail Fraud)

1.      The allegations contained in paragraphs 1 through 63 of the General Allegations section of the Indictment are realleged and incorporated as if set forth fully herein.

2.      From in or about 1994 through in or about December 2016, in the Eastern District of Virginia and elsewhere, defendants ROBERT JAMES McCABE and Conspirator #1 knowingly and intentionally conspired with each other and with other persons known and unknown to commit the following offense:  Mail Fraud, that is: having devised a scheme and artifice to defraud the citizens of the City of Norfolk through bribery, did knowingly place and caused to be placed in any post office and authorized depository for mail, any matter and thing whatever to be sent and delivered by the Postal Service; did deposit and caused to be deposited any matter and thing whatever to be sent and delivered by any private and commercial interstate carrier; and caused to be delivered by mail and such carrier any matter and thing whatever according to the direction thereon, in violation of Title 18, United States Code. Section 1341.

### PURPOSE

3.      The purpose of the conspiracy was for defendant ROBERT JAMES McCABE to secretly use his official position as the Sheriff of the City of Norfolk to enrich himself by soliciting and/or accepting payments, gifts, and other things of value from Conspirator #1 in exchange for ROBERT JAMES McCABE performing official actions. including certain specific official actions and other official actions on an as-needed basis to benefit Conspirator #1 and Company A.

### MANNER AND MEANS

The manner and means by which the conspirators would and did carry out the conspiracy included, but were not limited to. the following:

4.     The citizens of Norfolk repeatedly elected ROBERT JAMES McCABE to serve as the Sheriff of Norfolk.

5.     ROBERT JAMES McCABE solicited and/or accepted things of value including, but not limited to, free catering, travel, campaign contributions, entertainment, gift cards, and personal gifts from Conspirator #1 and others.

6.     Conspirator #1, and others at his direction, gave numerous things of value to ROBERT JAMES McCABE in exchange for favorable treatment related to Company A's food services contract for the Norfolk City Jail.

7.     In return, ROBERT JAMES McCABE violated RFP regulations and disclosed information to Conspirator #1 related to confidential bid proposals.

8.     ROBERT JAMES McCABE engaged in official acts related to the food services contract on behalf of Conspirator #1 on an as-needed basis and in specific official acts, including but not limited to, those set forth below:

   a.  ROBERT JAMES McCABE, in his capacity as Sheriff, ensured that Company A was selected to serve as the food services vendor for the Norfolk City Jail;

   b.  ROBERT JAMES McCABE, in his capacity as Sheriff, executed contracts on behalf of the Norfolk Sheriff's Office conferring financial benefits on Company A;

   c.  ROBERT JAMES McCABE, in his capacity as Sheriff, repeatedly exercised the options left to his discretion to extend Company A's contract beyond its original term to prevent Company A from having to participate in a new RFP;

   d.  ROBERT JAMES McCABE, in his capacity as Sheriff, granted Company A COLA increases and other terms that financially benefited Company A; and

   e.  ROBERT JAMES McCABE, in his capacity as Sheriff, advocated for and exercised waivers and other contract provisions containing favorable terms for Company A.

9.      In furtherance of this scheme, Conspirator #1 and ROBERT JAMES McCABE used the mails and/or private and commercial interstate carriers to facilitate payments to Company A.

10.      ROBERT JAMES McCABE took steps to conceal from the citizens of Norfolk the things of value received from Conspirator #1 and others including, but not limited to, omitting things of value given to McCABE from his Statement of Economic Interests and omitting in-kind political donations from his Campaign Finance Reports.

(In violation of Title 18, United States Code, Sections 1349, 1341, 1346.)

## COUNT TWO
### (Conspiracy to Commit Honest Services Mail Fraud)

1.      The allegations contained in paragraphs 1 through 63 of the General Allegations section of the Indictment are realleged and incorporated as if set forth fully herein.

2.      From in or about January 2004 through in or about December 2016, in the Eastern District of Virginia and elsewhere, defendants ROBERT JAMES McCABE and GERARD FRANCIS BOYLE knowingly and intentionally conspired with each other and with other persons known and unknown to commit the following offense:  Mail Fraud, that is: having devised a scheme and artifice to defraud the citizens of the City of Norfolk through bribery, did knowingly place and caused to be placed in any post office and authorized depository for mail, any matter and thing whatever to be sent and delivered by the Postal Service; did deposit and caused to be deposited any matter and thing whatever to be sent and delivered by any private and commercial interstate carrier; and caused to be delivered by mail and such carrier any matter and thing whatever according to the direction thereon, in violation of Title 18, United States Code, Section 1341.

### PURPOSE

3.      The purpose of the conspiracy was for defendant ROBERT JAMES McCABE to secretly use his official position as the Sheriff of the City of Norfolk to enrich himself by soliciting and/or accepting payments, gifts, and other things of value from GERARD FRANCIS BOYLE, and others known and unknown to the grand jury, in exchange for ROBERT JAMES McCABE performing official actions, including certain specific official actions and other official actions on an as-needed basis to benefit GERARD FRANCIS BOYLE and CCS.

### MANNER AND MEANS

The manner and means by which the conspirators would and did carry out the conspiracy included, but were not limited to, the following:

20

11.    The citizens of Norfolk repeatedly elected ROBERT JAMES McCABE to serve as the Sheriff of Norfolk.

12.    ROBERT JAMES McCABE solicited and/or accepted things of value including, but not limited to, gifts, cash, a loan, entertainment, sporting events, travel-related expenses, campaign contributions, undisclosed in-kind political donations, "McCABE for Mayor" cigars, autographed guitars, a TAGHeuer watch, and gift cards.

13.    ROBERT JAMES McCABE used certain campaign contributions obtained through this bribery scheme for purely personal purposes and falsified his campaign filings to conceal the scheme.

14.    GERARD FRANCIS BOYLE, and others at his direction, gave numerous things of value to ROBERT JAMES McCABE in exchange for specific requested exercises of McCABE's official authority as it related to CCS's medical services contract with the Norfolk City Jail.

15.    ROBERT JAMES McCABE violated RFP regulations and disclosed confidential information to GERARD FRANCIS BOYLE, and others, related to the bidding process.

16.    ROBERT JAMES McCABE engaged in official acts on behalf of GERARD FRANCIS BOYLE on an as-needed basis and in specific official acts, including but not limited to, those set forth below:

      a.    ROBERT JAMES McCABE, in his capacity as Sheriff, disclosed and directed others to disclose confidential bidding information to BOYLE and other CCS employees;

      b.    ROBERT JAMES McCABE, in his capacity as Sheriff, ensured that CCS was selected to serve as the medical services company for the Norfolk City Jail;

      c.    ROBERT JAMES McCABE, in his capacity as Sheriff, executed contracts on behalf of the Norfolk Sheriff's Office conferring substantial financial benefits on CCS;

    d.   ROBERT JAMES McCABE, in his capacity as Sheriff, repeatedly exercised options left to his discretion to extend CCS's contract beyond its original term to prevent CCS from having to participate in a new RFP;

    e.   ROBERT JAMES McCABE, in his capacity as Sheriff, awarded staffing cost adjustments to CCS that increased the value of its contract;

    f.   ROBERT JAMES McCABE, in his capacity as Sheriff, granted CPI (also called COLA) increases and other terms that financially benefited CCS;

    g.   ROBERT JAMES McCABE, in his capacity as Sheriff, exercised waivers and other contract provisions containing favorable terms for CCS;

    h.   ROBERT JAMES McCABE, in his capacity as Sheriff, agreed to alter the terms of the contract to decrease CCS's obligation to provide prescription drugs to certain inmates upon their release from the Norfolk City Jail; and

    i.   ROBERT JAMES McCABE, in his capacity as Sheriff, wrote numerous letters of reference in support of CCS.

17.    In furtherance of this scheme, ROBERT JAMES McCABE and GERARD FRANCIS BOYLE used the mails and/or private and commercial interstate carriers to facilitate payments to CCS.

18.    ROBERT JAMES McCABE took steps to conceal his bribery relationship with GERARD FRANCIS BOYLE from the citizens of Norfolk and others. Such steps included, but were not limited to, excluding in kind political donations from his Campaign Finance Reports, falsifying expenditures in his Campaign Finance Reports, and excluding a cash loan, gifts, and other things of value from his Statement of Economic Interests.

19.    GERARD FRANCIS BOYLE took steps to conceal his bribery relationship from the citizens of Norfolk and other local sheriffs. Such steps included, but were not limited to, preparing a $12,500 check payable to no one and giving the check to McCABE.

(In violation of Title 18, United States Code, Sections 1349, 1341, 1346.)

## COUNTS THREE-FOUR
### (Honest Services Mail Fraud)

1.      The allegations set forth in paragraphs 1 through 63 of the General Allegations section of the Indictment and Count 1 are realleged and incorporated as if set forth fully herein.

2.      From in or about 1994 through in or about December 2016, within the Eastern District of Virginia and elsewhere, defendants ROBERT JAMES McCABE, Conspirator #1, and other persons known and unknown to the grand jury, devised and intended to devise a scheme and artifice to defraud the citizens of the City of Norfolk of their right to the honest services of the Norfolk Sheriff through bribery.

3.      On or about the dates listed below, for the purposes of executing the aforesaid scheme and artifice, ROBERT JAMES McCABE, Conspirator #1, and other persons known and unknown to the grand jury, having devised a scheme and artifice to defraud the citizens of the City of Norfolk through bribery, did knowingly place and caused to be placed in any post office and authorized depository for mail, any matter and thing whatever to be sent and delivered by the Postal Service; did deposit and caused to be deposited any matter and thing whatever to be sent and delivered by any private and commercial interstate carrier; and caused to be delivered by mail and such carrier any matter and thing whatever according to the direction thereon, each mailing being a separate count of this indictment as indicated:

| Defendant | Count | Date | Mailing |
|-----------|-------|------|---------|
| McCABE | 3 | March 18, 2016 | City of Norfolk check to Company A for approximately $18,290.28 |
| McCABE | 4 | April 6, 2016 | City of Norfolk check to Company A for approximately $18,317.00 |

(In violation of Title 18, United States Code, Sections 1341, 1346, and 2.)

## COUNTS FIVE-SEVEN
### (Honest Services Mail Fraud)

1.      The allegations set forth in paragraphs 1 through 63 of the General Allegations section of the Indictment and Count 2 are realleged and incorporated as if set forth fully herein.

2.      From in or about 2004 through in or about December 2016, within the Eastern District of Virginia and elsewhere, defendants ROBERT JAMES McCABE, GERARD FRANCIS BOYLE, and other persons known and unknown to the grand jury, devised and intended to devise a scheme and artifice to defraud the citizens of the City of Norfolk of their right to the honest services of the Norfolk Sheriff through bribery.

3.      On or about the dates listed below, for the purposes of executing the aforesaid scheme and artifice, ROBERT JAMES McCABE. GERARD FRANCIS BOYLE, and other persons known and unknown to the grand jury, having devised a scheme and artifice to defraud the citizens of the City of Norfolk through bribery, did knowingly place and caused to be placed in any post office and authorized depository for mail, any matter and thing whatever to be sent and delivered by the Postal Service; did deposit and caused to be deposited any matter and thing whatever to be sent and delivered by any private and commercial interstate carrier; and caused to be delivered by mail and such carrier any matter and thing whatever according to the direction thereon, each mailing being a separate count of this indictment as indicated:

| Defendant | Count | Date | Mailing |
|---|---|---|---|
| McCABE BOYLE | 5 | December 23, 2015 | City of Norfolk check to CCS for approximately $321,754.54 |
| McCABE BOYLE | 6 | April 20, 2016 | City of Norfolk check to CCS for approximately $321,754.54 |
| McCABE BOYLE | 7 | April 25, 2016 | City of Norfolk check to CCS for approximately $321,754.54 |

(In violation of Title 18, United States Code, Sections 1341, 1346, and 2.)

## COUNT EIGHT
### (Conspiracy to Obtain Property Under Color of Official Right)

1.      The allegations contained in paragraphs 1 through 63 of the General Allegations section of the Indictment are realleged and incorporated as if set forth fully herein.

2.      From in or about 1994 through in or about December 2016, in the Eastern District of Virginia and elsewhere, defendant ROBERT JAMES McCABE and Conspirator #1 did knowingly and intentionally conspire together and with other persons known and unknown to the grand jury, to cause each other and others to obstruct, delay, and affect in any way and degree commerce, and the movement of articles and commodities in commerce, by extortion, as those terms are defined in Title 18, United States Code, Section 1951, that is to obtain property, not due ROBERT JAMES McCABE or his office and to which ROBERT JAMES McCABE was not entitled, from Conspirator #1 and others, with their consent, under color of official right.

(In violation of Title 18, United States Code, Section 1951.)

## COUNT NINE
### (Conspiracy to Obtain Property Under Color of Official Right)

1.     The allegations contained in paragraphs 1 through 63 of the General Allegations section of the Indictment are realleged and incorporated as if set forth fully herein.

2.     From in or about 2004 through in or about December 2016, in the Eastern District of Virginia and elsewhere, defendant ROBERT JAMES McCABE and GERARD FRANCIS BOYLE did knowingly and intentionally conspire together and with other persons known and unknown to the grand jury, to cause each other and others to obstruct, delay, and affect in any way and degree commerce, and the movement of articles and commodities in commerce, by extortion, as those terms are defined in Title 18, United States Code, Section 1951, that is to obtain property, not due ROBERT JAMES McCABE or his office and to which ROBERT JAMES McCABE was not entitled, from GERARD FRANCIS BOYLE and others, with their consent, under color of official right.

(In violation of Title 18, United States Code, Section 1951.)

**COUNT TEN**
**(Obtaining Property under Color of Official Right)**

1.      The allegations contained in paragraphs 1 through 63 of the General Allegations section of the Indictment are realleged and incorporated as if set forth fully herein.

2.      From in or about January 1994 through in or about December 2016, in the Eastern District of Virginia and elsewhere, defendant ROBERT JAMES McCABE did knowingly and intentionally obstruct, delay and affect in any way and degree commerce, and the movement of articles and commodities in commerce, by extortion, as those terms are defined in Title 18, United States Code, Section 1951, that is:  ROBERT JAMES McCABE obtained things of value not due ROBERT JAMES McCABE or his office and to which ROBERT JAMES McCABE was not entitled, from numerous individuals, with their consent, under color of official right.

(In violation of Title 18, United States Code, Sections 1951.)

## COUNT ELEVEN
### (Conspiracy To Commit Money Laundering)

1.     The allegations contained in paragraphs 1 through 63 of the General Allegations section of the Indictment are realleged and incorporated as if set forth fully herein.

2.     From in or about April 2016 through in or about December 2016, in the Eastern District of Virginia and elsewhere, defendants ROBERT JAMES McCABE, GERARD FRANCIS BOYLE, and Conspirator #2, together and with others known and unknown, knowingly and intentionally combined, conspired, confederated and agreed to commit the following offense against the United States, to wit, laundering of monetary instruments, that is, to knowingly conduct and attempt to conduct financial transactions affecting interstate and foreign commerce, which transactions involved the proceeds of specified unlawful activity, that is, honest services mail fraud, knowing that the transactions were designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, and that while conducting and attempting to conduct such financial transactions, knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

### MANNER AND MEANS

The ways, manner and means by which McCABE, BOYLE, Conspirator #2 and others sought to accomplish this conspiracy included, but were not limited to, the following:

1.     On or about April 15, 2016, BOYLE concealed the nature of the transaction by writing Check No. 1280 for $12,500 ("the check"), leaving the "Pay to the order of" line blank, and writing "Consulting" in the memo line before giving the check to McCABE.

28

2.      That same day, McCABE concealed the nature. control. and ownership of the funds by giving the check to Conspirator #2. instructing Conspirator #2 to write his name in the "Pay to the order of" line and deposit the funds into Conspirator #2's checking account.

3.      After Conspirator #2 received the check, Conspirator #2 approached three friends, asked them to make donations to the "McCABE for Mayor" campaign, and promised to reimburse them for their donation.  In total, the three friends donated $6,000 to the "McCABE for Mayor" campaign.

4.      After receiving BOYLE's check, Conspirator #2 made two campaign contributions to the "McCABE for Mayor" campaign  – one for $1,500 and another for $2,500 – through two of Conspirator #2's companies.

5.      On or about April 25. 2016, Conspirator #2 concealed the nature, control, and ownership of the funds by depositing the check into Conspirator #2's personal checking account at Heritage Bank.

6.      Conspirator #2 reimbursed all three friends for their "McCABE for Mayor" contributions.

7.      Conspirator #2 then reimbursed one of Conspirator #2's companies for its $1,500 campaign contribution.

8.      McCABE, BOYLE, and Conspirator #2 transferred the funds through various financial accounts to conceal their bribery relationship and BOYLE's and Conspirator #2's contributions to McCABE.

(In violation of Title 18, United States Code, Section 1956(h).)

**FORFEITURE**

THE GRAND JURY FURTHER FINDS PROBABLE CAUSE THAT:

1. The defendants, ROBERT JAMES McCABE and GERARD FRANCIS BOYLE, if convicted of the violation alleged in Count Eleven of this indictment, shall forfeit to the United States, as part of the sentencing pursuant to Federal Rule of Criminal Procedure 32.2, any property, real or personal, involved in the violation, or any property traceable to that property.

2. The defendants, ROBERT JAMES McCABE and GERARD FRANCIS BOYLE, if convicted of any of the violations alleged in Counts One through Ten of this indictment, shall forfeit to the United States, as part of the sentencing pursuant to Federal Rule of Criminal Procedure 32.2, any property, real or personal, which constitutes or is derived from proceeds traceable to the violation.

3. If any property that is subject to forfeiture above is not available, it is the intention of the United States to seek an order forfeiting substitute assets pursuant to Title 21, United States Code, Section 853(p) and Federal Rule of Criminal Procedure 32.2(e).

4. The assets subject to forfeiture include, but are not limited to, a monetary judgment in the amount of the proceeds of the offenses charged in Counts One through Ten above, as well as the amount involved in the offense charged in Count Eleven above.

(In accordance with Title 18, United States Code, Sections 981(a)(1)(C). and 982(a)(1): and Title 28, United States Code, Section 2461(c).)

Pursuant to the E-Government Act, the original of this page has been filed under seal in the Clerk's Office

*U.S. v. ROBERT JAMES McCABE & GERARD FRANCIS BOYLE,* 2:19CR  171

A TRUE BILL:

**REDACTED COPY**

_____

FOREPERSON

G. ZACHARY TERWILLIGER
UNITED STATES ATTORNEY

By:    *Melissa E. O'Boyle*
       _____
       Melissa E. O'Boyle
       Assistant United States Attorney
       United States Attorney's Office
       101 West Main Street, Suite 8000
       Norfolk, VA 23510
       Office Number - 757-441-6331
       Facsimile Number - 757-441-6689
       E-Mail Address - melissa.oboyle@usdoj.gov

By:    *Alan M. Salsbury*
       _____
       Alan M. Salsbury
       Assistant United States Attorney
       United States Attorney's Office
       101 West Main Street, Suite 8000
       Norfolk, VA 23510
       Office Number - 757-441-6331
       Facsimile Number - 757-441-6689
       E-Mail Address – alan.salsbury@usdoj.gov

By:    *Randy C. Stoker*
       _____
       Randy C. Stoker
       Assistant United States Attorney
       United States Attorney's Office
       101 West Main Street, Suite 8000
       Norfolk, VA 23510
       Office Number - 757-441-6331
       Facsimile Number - 757-441-6689
       E-Mail Address – randy.stoker@usdoj.gov