UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

FILED

MAR 1 9 2020

CLERK, U.S. DISTRICT COURT
NORFOLK, VA

UNITED STATES OF AMERICA,

v.

ROBERT JAMES MCCABE and
GERARD FRANCIS BOYLE,

          Defendants.

Criminal No. 2:19cr171

## ORDER

Pending before the Court are Defendant Robert James McCabe's and Defendant Francis
Gerard Boyle's Motions to Dismiss the Indictment for Failure to Allege a *Quid Pro Quo* (ECF
Nos. 34, 44); Defendant McCabe's Motion to Dismiss Count 11 for Failure to State the Offense
(ECF No. 39); Defendant Boyle's Motion to Dismiss Count 11 for Failure to State the Offense and
to Strike All Campaign Contribution Allegations from the Indictment (ECF No. 42); Defendant
McCabe's Motion to Strike Campaign Contributions from the Indictment (ECF No. 38); Defend-
ant McCabe's Motion (ECF No. 35) and Defendant Boyle's Requests for a Bill of Particulars;
Defendant McCabe's Motion *in Limine* to Exclude Evidence at Trial (ECF No. 37); and Defendant
Boyle's Motion to Sever (ECF No. 46).

After directing counsel to brief whether to conduct a hearing for oral argument to assist in
resolving these pending motions, the Court considered the parties' positions carefully and con-
cluded that a hearing is unnecessary. The issues and arguments are adequately presented in the
briefing on the Motions. The Motions are decided on the papers. For the following reasons, De-
fendant McCabe's and Defendant Boyle's Motions to Dismiss the Indictment for Failure to Allege
a *Quid Pro Quo* (ECF Nos. 34, 44) are **DENIED**; Defendant McCabe's Motion to Dismiss Count

1

Count 11 for Failure to State the Offense (ECF No. 39) is **DENIED**;  Defendant Boyle's Motion

to Dismiss Count 11 for Failure to State the Offense and to Strike References to Campaign Con-

tributions from the Indictment (ECF No. 42) is **GRANTED in part** and **DENIED in part** (Count

11 is **DISMISSED as to Defendant Boyle**); Defendant McCabe's Motion to Strike References to

Campaign Contributions from the Indictment (ECF No. 38) is **DENIED**; Defendant McCabe's

Motion (ECF No. 35) and Defendant Boyle's request for a Bill of Particulars are **DENIED;** De-

fendant McCabe's Motion *in Limine* to Exclude Evidence at Trial (ECF No. 37) is **DENIED**; and

Defendant Boyle's Motion to Sever (ECF No. 46) is **GRANTED**.

## I.    BACKGROUND

On October 24, 2019, the Government filed an Indictment against Robert James McCabe

and Gerard Francis Boyle.  Indictment, ECF No. 1.  Defendant McCabe was indicted on two counts

of Conspiracy to Commit Honest Services Mail Fraud, in violation of 18 U.S.C. § 1349 (Counts

1–2), five counts of Honest Services Mail Fraud, in violation of 18 U.S.C. §§ 1342, 2 (Counts 3–

7), two counts of Conspiracy to Obtain Property Under Color of Official Right, in violation of 18

U.S.C. § 1951 (Counts 8–9), one count of Obtaining Property Under Color of Official Right, in

violation of 18 U.S.C. § 1951  (Count 10), and one count of Conspiracy to Commit Money Laun-

dering, in violation of 18 U.S.C. § 1956(h) (Count 11).  *Id.*

Defendant Boyle was indicted on one count of Conspiracy to Commit Honest Services

Mail Fraud, in violation of 18 U.S.C. § 1349 (Count 2), three counts of Honest Services Mail

Fraud, in violation of 18 U.S.C. § 1341 (Counts 5–7), one count of Conspiracy to Obtain Property

Under Color of Official Right, in violation of 18 U.S.C. § 1951 (Count 9), and one count of Con-

spiracy to Commit Money Laundering, in violation of 18 U.S.C. § 1956(h) (Count 11).  *Id.*  De-

fendants McCabe and Boyle are jointly indicted on Counts 2, 5–7, 9, and 11.  *Id.*

An unnamed individual involved in Counts 1, 3–4, and 8—Counts filed solely against De-

fendant McCabe—is referred to as Conspirator #1. Another unnamed individual, who is involved

only in Count 11—filed against both Defendant McCabe and Defendant Boyle—is referred to as

Conspirator #2.

> The Indictment alleges that:

> from in or about 1994 through in or about December 2016, [D]efendants McCabe, Boyle, Conspirator #1, Conspirator #2, and others . . . engaged in unlawful bribery schemes. In these schemes, McCabe used his official position as the Norfolk Sheriff to enrich himself by soliciting things of value including, but not limited to, gifts, food, cash, travel, entertainment, campaign contributions, in-kind political donations, and other things of value from Conspirator #1, Boyle, and other individuals with interests connected to the Norfolk Sheriff's office and the City of Norfolk. In exchange for these items, McCabe agreed to perform and performed official actions, including certain specific official actions and other official actions on an as-needed basis to benefit Boyle, Conspirator #1, and others.

*Id.* at 3.

The Indictment elaborates upon Defendant McCabe's alleged *quid pro quo* relationship

with Conspirator #1. According to the Indictment, this *quid pro quo* relationship involved a con-

tract with Conspirator #1's business—Company A—to provide food services for the Norfolk City

Jail. *Id.* The Government alleges that Defendant McCabe disclosed confidential bid information

to Conspirator #1, allowing Conspirator #1 to submit the lowest bid and win the contract. *Id.* at

3–4.

> After McCabe disclosed confidential bid information to Conspirator #1, the conspirators established an illegal *quid pro quo* relationship. From in or about 1994 through in or about December 2016, McCabe requested and received free catering, travel, campaign contributions, entertainment, gift cards, and personal gifts from Conspirator #1 and, in exchange, McCabe performed specific official acts and acts on an as-needed basis related to Company A's food services contract with the Norfolk Sheriff's Office. Such official acts included, but were not limited to, granting extensions to Company A's food services contract without putting the contract out to bid, providing inside information to Company A related to [Requests for Proposals] RFPs, and providing Cost of Living ("COLA") adjustments that had the effect of increasing payments to Company A.

3

*Id.* at 4.

The Indictment specifies that Conspirator #1 "regularly provided free catering for McCabe's annual golf tournament, personal Christmas parties, and an annual 'Big Blue BBQ' at Old Dominion University, and also provided food for the Norfolk Sheriff's Office." *Id.* at 4–5. Defendant McCabe allegedly "requested . . . and received hundreds of dollars in gift cards to restaurants and stores such as the Village Butcher and Todd Jurich's Bistro." *Id.* at 5. Conspirator #1 also provided "substantial campaign contributions." *Id.* "Conspirator #1 understood that McCabe would not use and continue to use Company A for food services at the Norfolk City Jail if Conspirator #1 did not provide such personal benefits." *Id.*

On the basis of this relationship with Conspirator #1, Defendant McCabe is charged in the Indictment with Counts 1, 3–4, and 8, all of which reallege and incorporate the "General Allegations" section of the Indictment, which describes the relationship between Defendant McCabe and Conspirator #1 as recited above. Count 1 charges Defendant McCabe with Conspiracy to Commit Honest Services Mail Fraud, in violation of 18 U.S.C. § 1341. *Id.* at 17. Counts 3 and 4 charge Defendant McCabe with Honest Services Mail Fraud, in violation of 18 U.S.C. §§ 1341, 1346. *Id.* at 23. Count 8 charges Defendant McCabe with Conspiracy to Obtain Property Under Color of Official Right, in violation of 18 U.S.C. § 1951. *Id.* at 25.

The Indictment also elaborates upon Defendant McCabe's and Defendant Boyle's alleged *quid pro quo* relationship. According to the Indictment, Defendant Boyle is the founder and CEO of Correct Care Solutions ("CCS"). *Id.* at 2. This alleged *quid pro quo* relationship involved a contract with CCS to provide medical services to the inmates at the Norfolk City Jail. *Id.* at 5.

> Starting in or about January 2004 through in or about December 2016, McCabe and Boyle engaged in a transactional relationship and a knowing course of conduct during which Boyle agreed to give gifts and things of value to McCabe and, in exchange for which, McCabe agreed to exercise his official authority to take actions

4

that were favorable to Boyle's company in connection with its medical services contract. During the course of this conspiracy, McCabe solicited and/or accepted many things of value, including but not limited to cash, a loan, entertainment— including attendance at the Richard Petty Driving Experience and concerts—as well as travel-related expenses, campaign contributions, undisclosed in-kind political donations such as all-expense paid trips to Nashville, "McCabe for Mayor" cigars, autographed guitars, a TAGHeuer watch, gift cards, and other personal gifts from Boyle. In exchange, McCabe performed specific official acts and official acts on an as-needed basis related to CCS's medical services contract with the Norfolk Sheriff's Office. Such official acts included, but were not limited to, providing inside information to CCS's representatives during confidential bidding processes; ensuring that CCS was selected as the medical services provider; granting extensions to CCS's medical services contract without putting the contract out to bid; providing inside information to CCS regarding [Requests for Proposals ("RFPs")]; awarding staffing cost adjustments to CCS increasing the value of their contract; reducing CCS's obligations to provide prescription drugs to certain inmates upon their release; and providing . . . "COLA" adjustments.

*Id.* at 5–6.

The Indictment describes various meetings that Defendant McCabe and Defendant Boyle had regarding the CCS proposal and contract to provide medical services to the Norfolk City Jail.

*Id.* at 7. At one meeting, held at Defendant McCabe's home,

McCabe and Boyle told all of the other individuals present to leave the room so that they could negotiate the deal. After the private negotiations were finished, McCabe, Boyle, and the other meeting attendees went to . . . a bar in Norfolk[] to celebrate. The next day, at Boyle's direction, a CCS employee sent a letter revising CCS's proposal and documenting the deal struck the previous day at McCabe's home. Less than a week later, . . . McCabe, as the Norfolk Sheriff, sent a letter to the Purchasing Agent for the City of Norfolk stating: "I have approved the recommendation of my medical RFP review committee to award an Agreement to Correct Care Solutions, LLC to provide medical services for our inmates . . . ."

*Id.*

The Indictment describes some of the benefits that Defendant McCabe allegedly asked for or received, including attending a concert in Nashville, Tennessee; tickets to a professional football game between the Washington Redskins and Green Bay Packers; concert attendance with backstage passes; and campaign contributions. *Id.* at 8–9. In one instance, Defendant Boyle sent an email to two investors, stating: "When you get a chance, I would appreciate a check to 're-elect

Robert McCabe Sheriff.' Because you are miracle workers the Sheriff has also stated that 'it would

be cool if [Ronnie Dunn or Alan Jackson] could write a check supporting my campaign.' . . . That

was his request and our contract is out to bid in January for a July renewal." *Id.* at 9.

The Indictment also describes some of the actions Defendant McCabe took to benefit De-

fendant Boyle and CCS. For example, the Indictment alleges that

> [o]n or about August 17, 2020, in response to [an] RFP, CCS submitted its "best
> and final offer" to the City of Norfolk. CCS was not the lowest bidder. . . . [A]
> member of the [selection] committee who worked for McCabe disclosed to him that
> CCS's bid was not the lowest. In fact, a competitor's best and final offer was ap-
> proximately $185,000 lower per year than CCS's best and final offer. In response,
> McCabe told this employee that he should contact a certain CCS representative and
> provide confidential bid information, but the employee refused to do so. The se-
> lection committee did not award the contract based on the best and final offers.
> Instead, on or about October 25, 2010, the Norfolk Purchasing Agent sent an email
> to all bidders directing them to prepare a second best and final offer and respond
> within four days.
>     On or about October 29, 2010, Boyle submitted CCS's second best and final
> offer, which dropped CCS's price by $205,000 and provided a false justification
> for the reduction. After that reduction, CCS was the lowest bidder by approxi-
> mately $16,000. Five days later, McCabe informed the Purchasing Agent that CCS
> was "determined to be the most advantageous" bid for the City. Over the course of
> the following year, Boyle provided numerous things of value including, but not
> limited to, a cash loan, campaign contributions, and cash payments directly to
> McCabe.

*Id.* at 11.

The Indictment alleges many examples of Defendant McCabe taking official action advan-

tageous to Defendant Boyle and CCS, and many instances of Defendant Boyle providing benefits

to Defendant McCabe. One of the benefits was a personal check for $12,500. *Id.* at 13. In writing

this check, Defendant Boyle "left the 'Pay to the order of' line blank, [and] wrote 'Consulting' in

the memo line," even though "Boyle knew that this check had nothing to do with 'consulting' and

used that term to mask its purpose. Later that day, Boyle sent an email to a CCS employee: 'at the

airport . . . [and] Sheriff McCabe is in a good place with us.'" *Id.* at 13.

Defendant McCabe, for his part, "[a]fter receiving the check from Boyle, . . . gave the check to Conspirator #2 and instructed Conspirator #2 to write his name in the 'Pay to the order of' line and deposit the funds into Conspirator #2's checking account. . . . After Conspirator #2 received the check, Conspirator #2 approached three friends, asked them to make campaign contributions to the 'McCabe for Mayor' campaign,[1] and promised to reimburse them for their contributions." *Id.* The three friends then donated a total of $6,000 to the "McCabe for Mayor" campaign. Conspirator #2 also made two donations to the "McCabe for Mayor" campaign through two of Conspirator #2's companies. *Id.* Conspirator #2 reimbursed his three friends and one of his companies for the money they contributed to Defendant McCabe's campaign for Mayor. *Id.* at 14.

On the basis of these allegations regarding Defendant McCabe's relationship with Defendant Boyle, as well as others detailed in the Indictment's "General Allegations" section, Defendant McCabe and Defendant Boyle were indicted on Counts 2, 5–7, 9, and 11. Count 2 charges Defendant McCabe and Defendant Boyle with Conspiracy to Commit Honest Services Mail Fraud, in violation of 18 U.S.C. § 1341. *Id.* at 20–22. Counts 5 through 7 charge Defendant McCabe and Defendant Boyle with Honest Services Mail Fraud, in violation of 18 U.S.C. §§ 1341 and 1346. *Id.* at 24. Count 9 charges Defendant McCabe and Defendant Boyle with Conspiracy to Obtain Property Under Color of Official Right, in violation of 18 U.S.C. § 1951. *Id.* at 26. Count 11 charges Defendant McCabe and Defendant Boyle with Conspiracy to Commit Money Laundering, in violation of 18 U.S.C. § 1956. *Id.* at 28.

---

[1] Defendant McCabe, although still serving a Sheriff, was campaigning for Mayor of the City of Norfolk. He lost that election for Mayor and remained the Sheriff of Norfolk. *Id.* at 12, 14.

In addition to the above charges involving Defendant McCabe and either Conspirator #1 or Defendant Boyle, Count 10 charges Defendant McCabe alone with Obtaining Property under Color of Official Right, in violation of 18 U.S.C. § 1951. *Id.* at 27. This count is based on Defendant McCabe's alleged conduct from 1994 through December 2016. *Id.*

For all eleven counts, the Indictment describes the elements of each offense and asserts that the actions of Defendant McCabe and Defendant Boyle, Conspirator #1, Conspirator #2, or unnamed individuals satisfy the elements of the applicable offense. Several of the Counts—Counts 1, 2, and 11—also include allegations regarding the purpose of the scheme and the manner and means by which the scheme was committed. All counts reallege and incorporate the information included in the "General Allegations" section of the Indictment, including the paragraphs describing the relationships between Defendant McCabe and Conspirator #1 and Defendant McCabe and Defendant Boyle.

Both Defendants move to dismiss the Indictment for failure to adequately allege a *quid pro quo* relationship. Mots. to Dismiss *Quid Pro Quo*, ECF Nos. 34, 44. Both Defendants move to Dismiss Count 11 for failure to state the offense, as well as for other infirmities. Mots. to Dismiss Count 11, ECF Nos. 39, 42. Defendants also move to strike any reference in the Indictment to campaign contributions or campaign finance, arguing that the Government has failed to adequately allege a *quid pro quo* relationship in which campaign contributions serve as the "*quid.*" Mots. to Strike, ECF Nos. 38, 42. Defendants request a bill of particulars. Mot. for Bill of Particulars, ECF No. 35; Mem. in Supp. Mot. to Dismiss at 10–13, ECF No. 45. Defendant McCabe moves *in limine* to exclude evidence of campaign finance or reporting requirements at trial. Mot. to Exclude, ECF No. 37. Defendant Boyle also moves to sever the trial on Counts 2, 5, 6, 7, 9,10, and 11 from

8

the trial on Counts 1, 3, 4, and 8, which Defendant Boyle asserts are entirely unrelated to him and his conduct. Mot. to Sever, ECF No. 46.

## II.    MOTIONS TO DISMISS

Defendants move to dismiss the Indictment for failure to allege a *quid pro quo*. Mots. to Dismiss, ECF Nos. 34, 44. Defendants also move to dismiss Count 11 for failure to allege an explicit *quid pro quo*, and for other failures in stating the offense. Mots. to Dismiss, ECF Nos. 39, 42. For the reasons below, Defendants' Motions to Dismiss the Indictment for failure to allege a *quid pro quo* (ECF Nos. 34, 44) are denied. Defendant McCabe's Motion to Dismiss Count 11 (ECF No. 39) is denied. Defendant Boyle's Motion to Dismiss Count 11 (ECF No. 42) is granted in part and denied in part.

### A.    Legal Standard

A defendant may raise a motion alleging a defect in an indictment at any time prior to trial. Fed. R. Crim. P. 12(b)(3)(B). An indictment may be challenged for lack of specificity or failure to state an offense. *Id.*

"[A]n indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling v. United States*, 418 U.S. 87, 117 (1974) (citations omitted). "It is generally sufficient that an indictment set forth the offense in the words of the statute itself, as long as those words . . . themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the [offense] intended to be punished" and is "accompanied with such a statement of the facts and circumstances as will inform the accused of the specific [offense], coming under the general description, with which he is charged." *Id.* at 117–18 (quotations omitted).

A term with a "sufficiently definite" legal meaning does not need to be defined in an indictment. *Id.* at 118. Where a term has such a sufficiently definite legal meaning, the use of the term in the indictment provides the defendant with adequate notice of the charge against him. *Id.*

As the United States Supreme Court has said, "the Federal Rules 'were designed to eliminate technicalities in criminal pleadings and are to be construed to secure simplicity in procedure.' While detailed allegations might well have been required under common-law pleading rules, they surely are not contemplated by Rule 7(c)(1) . . . ." *United States v. Resendiz-Ponce*, 549 U.S. 102, 110 (2007) (quoting *United States v. Debrow*, 346 U.S. 374, 376 (1953)) (citations omitted).

**B.**     **Failure to Allege *Quid Pro Quo***

Defendants' Motions to Dismiss the Indictment for Failure to Allege *Quid Pro Quo* (ECF Nos. 34, 44) are denied. The Government has adequately alleged a *quid pro quo* relationship between Defendant McCabe and Defendant Boyle, and between Defendant McCabe and Conspirator #1.

*i.     The Elements of the Offenses and the Requirements of a Quid Pro Quo*

Defendants have been charged with Honest Services Mail Fraud (or conspiracy to commit the same)—Counts 1 through 7—and Hobbs Act Extortion under color of official right (or conspiracy to commit the same)—Counts 8 through 10. *See* Indictment, ECF No. 1 (citing 18 U.S.C. §§ 1341, 1349, and 1951).

The elements of Honest Services Mail Fraud are: "that the defendant (1) devised or intended to devise a scheme to defraud and (2) used the mail or wire communications in furtherance of the scheme. *United States v. Pinson*, 860 F.3d 152, 168 (4th Cir. 2017) (quotations omitted). "To establish a scheme to defraud, 'the government must prove that the defendant acted with the *specific intent to defraud*.' Thus, the mail fraud and wire fraud statutes have as [a third] element

the specific intent to deprive one of something of value through a misrepresentation or other similar dishonest method . . . ." *United States v. Wynn*, 684 F.3d 473, 478 (4th Cir. 2012) (alteration omitted) (emphasis in original) (quoting *United States v. Godwin*, 272 F.3d 659, 666 (4th Cir. 2001)). "One such 'scheme to defraud' is defined in § 1346: the deprivation of another's intangible right to the defendant's honest services. As interpreted by the Supreme Court, § 1346 covers bribery and kickback schemes." *Pinson*, 860 F.3d at 168 (citing *Skilling v. United States*, 561 U.S. 358, 368 (2010)).

A conspiracy to commit Honest Services Mail Fraud has two elements: "(1) that two or more persons agreed to commit [mail] fraud; and (2) that at some time during the conspiracy, the defendant had knowledge of the criminal objective of the agreement and willfully joined the conspiracy with the intent to further its unlawful purpose." *United States v. Vinson*, 852 F.3d 333, 351 (4th Cir. 2017).

"The Hobbs Act defines 'extortion,' in pertinent part, as 'the obtaining of property from another, with his consent, . . . under color of official right.' In order to prove such a Hobbs Act Extortion offense, the prosecution 'need only show that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts.'" *United States v. Ocasio*, 750 F.3d 399, 409 (4th Cir. 2014), *aff'd* 136 S. Ct. 1423 (2016) (quoting 18 U.S.C. § 1951(b)(2); *Evans v. United States*, 504 U.S. 255, 268 (1992)). Extortion under the Hobbs Act is "the rough equivalent of . . . 'taking a bribe.'" *Ocasio v. United States*, 136 S. Ct. at 1428 (quoting *Evans*, 504 U.S. at 260).

"Under longstanding principles of conspiracy law, a defendant may be convicted of conspiring to violate the Hobbs Act based on proof that he entered into a conspiracy that had as its objective the obtaining of property from another conspirator with his consent and under color of

official right." *Id.* at 1429. "[T]he fundamental characteristic of a conspiracy is a joint commit-
ment to an endeavor which, if completed, would satisfy all of the elements of the underlying sub-
stantive criminal offense." *Id.* (quotations and alterations omitted).

The parties appear to agree that bribery should be defined as it was defined in *McDonnell
v. United States* referencing the federal bribery statute, 18 U.S.C. § 201. Under this statute, the
Government must prove that Defendant McCabe "committed (or agreed to commit) an 'official
act' in exchange for the loans and gifts." *McDonnell v. United States*, 136 S. Ct. 2355, 2357 (2016)
(citing 18 U.S.C. § 201). As for Defendant Boyle, the Government must establish that he had the
"specific intent to give . . . something of value in exchange for an official act." *United States v.
Sun-Diamond Growers of Cal.*, 526 U.S. 398, 404–05 (1999) (emphasis omitted). In other words,
the Government must establish a *quid pro quo* exchange.

The bribery statute defines an official act as "any decision or action on any question, matter,
cause, suit, proceeding or controversy, which may at any time be pending, or which may by law
be brought before any public official . . . ." 18 U.S.C. § 201(a)(3). The decision in *McDonnell*
clarified that the Government must make two showings to meet this definition. First,

> [t]he "question, matter, cause, suit, proceeding or controversy" must involve a for-
> mal exercise of governmental power that is similar in nature to a lawsuit before a
> court, a determination before an agency, or a hearing before a committee. It must
> . . . be something specific and focused that is "pending" or "may by law be brought"
> before a public official.

Second,

> the public official must make a decision or take an action on that "question, matter,
> cause, suit, proceeding or controversy," or agree to do so. That decision or action
> may include using his official position to exert pressure on another official to per-
> form an "official act," or to advise another official, knowing or intending that such
> advice will form the basis for an "official act" by another official. Setting up a
> meeting, talking to another official, or organizing an event (or agreeing to do so)—
> without more—does not fit that definition of "official act."

*McDonnell*, 136 S. Ct. at 2371–72.

However,

> [t]he agreement need not be explicit, and the public official need not specify the
> means that he will use to perform his end of the bargain. . . . It is up to the jury,
> under the facts of the case, to determine whether the public official agreed to per-
> form an "official act" at the time of the alleged *quid pro quo*. The jury may consider
> a broad range of pertinent evidence, including the nature of the transaction, to an-
> swer that question.

*Id.* at 2371.

Thus, the *quid pro quo* agreement may be either express or implied. *Id.* The official need

not identify the particular act to be performed at the time of the agreement. *Id.*; *see also United

States v. Silver*, 948 F.3d 538, 553 (2d Cir. 2020) (finding "no error in the portion of the district

court's instructions explaining that 'the government does not have to prove that there was an agree-

ment that any particular action would be taken in exchange for the bribe'" (alterations omitted)).

Only the specific question or matter to be influenced must be identified contemporaneously with

the agreement. *Id.* at 555 ("[F]or an official to promise to perform an official act—and thereby

engage in the prohibited *quid pro quo*—the official must promise to act *on* an identified 'question,

matter, cause, suit, proceeding, or controversy' at the time of the promise." (emphasis in original)).

Accordingly, the "stream of benefits" theory of bribery is viable after the *McDonnell* deci-

sion. *Woodward v. United States*, 905 F.3d 40, 46 (1st Cir. 2018). Under a stream of benefits

theory of bribery, "bribery can be accomplished through an ongoing course of conduct, so long as

the evidence shows that the favors and gifts flowing to a public official are in exchange for a

pattern of official actions favorable to the donor." *Id.* (quotations, alterations, and emphasis omit-

ted). *McDonnell* clarifies that the pattern of official actions must pertain to a specific "question,

matter, cause, suit proceeding, or controversy" that is identified at the time the benefits were

offered to and accepted by the official.[2] *Silver*, 948 F.3d at 553 ("[A] public official must do more than promise to take some or any official action beneficial to the payor as the opportunity to do so arises; [he] must promise to take official action *on a particular question or matter* as the opportunity to influence that same question or matter arises." (emphasis in original)).

An ordinary *quid pro quo* agreement does not require a "meeting of the minds." *Id.* at 549. The Government only need show that "the victims were motivated to make payments as a result of the [official's] control or influence . . . and that the [official] was aware of this motivation," and that the official "convey[ed] to the payor . . . that he will take or refrain from taking certain official action in return for payment." *Id.* (quotations omitted). The payor and the official need not share a common purpose. *Id.*

Additionally,

> [o]nce the quid pro quo has been established, . . . the specific transactions comprising the illegal scheme need not match up this for that. While it frequently will be true that particular bribes or extorted payments are linked at the time of the corrupt agreement to particular official acts, that will not always be the case—for example,

---

[2] For example, the United States Court of Appeals for the Second Circuit has reasoned:
> [a]n official accepts a bribe, stating to the payor that [he] will "take official acts as the opportunities arise." In other words, the official has promised to take—as the opportunities arise—"*any* decision or action on *any* question, matter, cause, suit, proceeding or controversy that may at any time be pending," a promise so vague as to be meaningless. The official has not agreed to take official action on a properly defined—*i.e.* focused, concrete and specific—question or matter. The official has failed to offer a *quo*. Absent any additional specificity, criminal liability could attach to any later action the official takes so long as the official is exercising some ability granted to him or her by law, regardless of the fact that the official essentially promised nothing in return for the payment.

*Silver*, 948 F.3d at 556–57 (alterations and quotations omitted) (second emphasis added). This is prohibited under *McDonnell*.

In contrast: an official accepts a bribe, stating to the payor that he will do something—although he does not specify what he will do—about a *specific question or matter* as the opportunities to act on that specific question or matter arise. Criminal liability may attach only to later actions taken by the official on that specific question or matter. This is within the contours of *McDonnell* and appropriately avoids the risk of "subject[ing public officials] to prosecution, without fair notice, for the most prosaic interactions." *McDonnell*, 136 S. Ct. at 2373.

> because the opportunity to undertake the requested act has not arisen, or because the payment is one of a series to ensure ongoing commitment to perform acts to further the payor's interest.

*United States v. Ganim*, 510 F.3d 134, 147 (2d Cir. 2007).

In confronting the issue of what qualifies as an official act after *McDonnell*, the United States Court of Appeals for the Fourth Circuit has ruled that a "government contract" qualifies as a "specific matter" under the limitations of *McDonnell*. *United States v. Conrad*, 760 F. App'x 199, 208 (4th Cir. 2019). "[F]acilitating the award of government contracts—*and then maintaining those contracts*—" qualifies as making a decision or taking an action on a specific matter. *Id.* (citing *United States v. Repak*, 852 F.3d 230, 254 (3d Cir. 2017) (emphasis added) (holding that where a defendant "had the power to, and indeed did, make recommendations . . . as to the contractors it hired for projects[, t]he evidence was sufficient for the jury to conclude that he accepted [items of value] knowing that he was to use his power, *i.e.*, the ability to provide advice, to influence [the] awarding of contracts. . . . Therefore, the facilitation of the award of [government] contracts is an 'official act' as defined by *McDonnell*")); *see also Pinson*, 860 F.3d at 168 (finding that defendant's "signing of [a] contract qualifies as an 'official act,' even under the more restrictive definition that the Supreme Court recently adopted when interpreting the term in" *McDonnell*).

### ii. The Indictment Sufficiently Alleges a Quid Pro Quo

Defendants argue that the Indictment fails to adequately allege a *quid pro quo*. Defendants argue that *McDonnell* "plainly" requires that the "participants to the alleged bribery scheme understand, at the time of the bribe, the specific acts that will be performed in exchange for the bribes." Def. Boyle Mem. in Supp. at 8, ECF No. 45. Because the Indictment does not specify which acts Defendant McCabe agreed to perform at the time of the agreement, Defendants argue that the Indictment is insufficient. *Id.*

15

a. Defendants mischaracterize the holding of *McDonnell*

Defendants mischaracterize the holding in *McDonnell*. The issue that the Supreme Court addressed in *McDonnell* was not the specificity of the agreement between the briber and the public official. "The issue in [*McDonnell* was] the proper interpretation of the term 'official act.'" *McDonnell*, 136 S. Ct. at 2367.

In defining the requirements of an "official act," the Supreme Court clarified that the official must agree to act on a "question, matter, cause, suit, proceeding or controversy" that is "specific and focused." *Id.* at 2372. Contrary to Defendants' assertion, the Court never held that the official had to describe at the time of the agreement the specific acts he would take on that specific "question, matter, cause, suit, proceeding or controversy."[3] *See Silver*, 948 F.3d at 552–53 (2d

_____

[3] The portions of *McDonnell* quoted by Defendant Boyle in his Memorandum to support his mischaracterization are taken from two different paragraphs. Defendant asserts: "In *McDonnell v. United States*, the Supreme Court unanimously held that, for *quid pro quo* bribery charges, the Government must show that 'the public official agreed to perform an official act *at the time of* the alleged quid pro quo,' and that the official act 'must be something *specific and focused*.'" Mem. in Supp. at 13, ECF No. 45 (emphasis in original). Examining these selective quotes in the context of the paragraphs from which they have been excised supports the Government's interpretation of *McDonnell*. The *McDonnell* Court held:

> It is up to the jury, under the facts of the case, to determine whether the public official agreed to perform an official act at the time of the alleged *quid pro quo*. The jury may consider a broad range of pertinent evidence, including the nature of the transaction to answer that question. . . . In sum, an "official act" is a decision or action on a "question, matter, cause, suit, proceeding or controversy." The "question, matter, cause, suit, proceeding or controversy" must involve a formal exercise of governmental power that is similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee. It must also be something specific and focused that is "pending" or "that may by law be brought" before a public official. To qualify as official act, the public official must make a decision or take an action on that "question, matter, cause, suit, proceeding or controversy," or agree to do so.

*McDonnell*, 136 S. Ct. at 2371–72.

Cir. 2020) (rejecting the argument "that *McDonnell* requires identification of a particular *act* of influence," but recognizing "that it requires identification of a particular *question or matter*").

The *McDonnell* Court specifically recognized that "the official need not specify the means that he will use to perform his end of the bargain." *McDonnell*, 136 S. Ct. at 2371. Regarding the Government's burden to prove the existence of an agreement, the *McDonnell* Court stated explicitly that it is up to the jury to decide whether sufficient facts establish that an agreement existed, and that the jury could consider "a broad range of pertinent evidence" in making that decision. *Id.* Requiring the Government to show that the official specified what acts he would perform at the time of the agreement would be inconsistent with *McDonnell*'s holding.

*McDonnell* did not change the law regarding what the Government must prove to establish the existence of an *agreement* to exchange benefits for official acts. It merely changed the law regarding what constitutes an official act.

> b. The Indictment alleges that Defendant McCabe agreed to act as opportunities arose on CCS's medical services contract and Company A's food services contract

The Indictment sufficiently alleges that Defendant McCabe agreed to act on a specific and focused "question, matter, cause, suit, proceeding or controversy" that involves "a formal exercise of governmental power that is similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee." *Id.* at 2371–72.

The Indictment alleges that

[a]s the Sheriff of the City of Norfolk, McCabe . . . was charged with the custody, feeding, and care of all prisoners confined in the Norfolk City Jail. As a result, McCabe exercised vast discretion over public contracts providing for, among other things, the medical services and food services to inmates residing in the jail. . . . Conspirator #1 was the Chief Executive Officer of Company A, a . . . company that

---

The Supreme Court clearly did not hold that the *official act* must be specific and focused. It held plainly that the "question, matter, cause, suit, proceeding or controversy" must be specific and focused.

17

provided food services management to the Norfolk City Jail. Gerard Francis Boyle was the founder and Chief Executive Officer of Correct Care Solutions ("CCS"). Since 2004, the Norfolk Sheriff's Office has contracted with CCS to provide medical services to the inmates at the Norfolk City Jail. . . . [F]rom in or about 1994 through in or about December 2016, defendants McCabe, Boyle, [and] Conspirator #1 . . . engaged in in unlawful bribery schemes. In these schemes, McCabe used his official position as the Norfolk Sheriff to enrich himself by soliciting things of value including, but not limited to, gifts, food, cash, travel, entertainment, campaign contributions, in-kind political donations, and other things of value from Conspirator #1, Boyle, and other individuals with interests connected to the Norfolk Sheriff's office and the City of Norfolk. In exchange for these items, McCabe agreed to perform and performed official acts, including certain official actions and other official actions on as as-needed basis to benefit Boyle, Conspirator #1, and others.

Indictment at 2–3, ECF No. 1.

The Indictment describes the "*Quid Pro Quo* Relationship" between Defendant McCabe and Conspirator #1. *Id.* at 3–4. "In or about 1994, Company A received a one-year emergency food services contract for the Norfolk City Jail." *Id.* at 3. Around the time that this emergency services contract was set to expire, the City of Norfolk issued an RFP for a more permanent contract. *Id.* The Indictment provides examples of actions that McCabe took to give Company A an advantage in acquiring the contract. *Id.* at 3–4.

On or about July 1, 1995, McCabe, as the Sheriff of Norfolk, signed a contract with Company A to provide food services for the inmates at the Norfolk City Jail. The contract was for a term of one year and gave the Sheriff the option to renew the contract for two additional years. . . . After McCabe disclosed confidential bid information to Conspirator #1, the conspirators established an illegal *quid pro quo* relationship. From in or about 1994 through in or about December 2016, McCabe requested and received free catering, travel, campaign contributions, entertainment, gift cards, and personal gifts from Conspirator #1 and, in exchange, McCabe performed specific official acts and acts on an as-needed basis *related to Company A's food services contract*. Such official acts included, but were not limited to, granting extensions to Company A's food services contract without putting the contract out to bid, providing inside information to Company A related to RFPs, and providing Cost of Living ("COLA") adjustments that had the effect of increasing payments to Company A.

*Id.* at 4 (emphasis added). The Indictment specifies a number of benefits Defendant McCabe requested or received. *Id.* at 4–5.

18

The Indictment also describes the "*Quid Pro Quo* Relationship" between Defendant McCabe and Defendant Boyle. *Id.* at 5–15. "Starting in or about January 2004 through in or about December 2016, McCabe and Boyle engaged in a transactional relationship and a knowing course of conduct during which Boyle agreed to give gifts and things of value to McCabe and, in exchange for which, McCabe agreed to exercise his official authority to take actions that were *favorable to Boyle's company in connection with its medical services contract*." *Id.* at 5 (emphasis added). The Indictment provides an extensive list of examples of "gifts and things of value" allegedly given by Defendant Boyle to Defendant McCabe. *Id.* The Indictment also provides examples of official acts that Defendant McCabe allegedly performed on CCS's medical services contract, including:

> providing inside information to CCS's representative during confidential bidding processes; ensuring that CCS was selected as the medical services provider; granting extensions to CCS's medical services contract without putting the contract out to bid; providing inside information to CCS regarding RFPs; awarding staffing cost adjustments to CCS increasing the value of their contract; reducing CCS's obligations to provide prescription drugs to certain inmates upon their release; and providing . . . "COLA" adjustments.

*Id.* at 5–6. The subsequent eight pages of the Indictment set forth detailed factual allegations regarding the relationship between Defendant McCabe and Defendant Boyle as it relates to CCS's medical services contract. *Id.* at 6–15.

The Indictment is plainly sufficient. As the United States Supreme Court has recognized, "the Federal Rules 'were designed to eliminate technicalities in criminal pleadings and are to be construed to secure simplicity in procedure.' While detailed allegations might well have been required under common-law pleading rules, they surely are not contemplated by Rule 7(c)(1), which provides that an indictment 'shall be plain, concise, and definite written statement of the essential facts constituting the offense charged.'" *Resendiz-Ponce*, 549 U.S. at 111 (quoting *Debrow*, 346 U.S. at 376) (citations omitted). Accordingly, "an indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against

19

which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling*, 418 U.S. at 117 (citations omitted).

The Indictment fully protects Defendants "from again being put in jeopardy for the same offense . . . ." *Russell v. United States*, 369 U.S. 749, 764 (1962) (finding defendants protected against double jeopardy where the indictments "set out not only the times and places of the hearings at which the petitioners refused to testify, but also specified the precise questions which they then and there refused to answer"). The Indictment provides the time period over which the offenses are alleged to have occurred. It identifies the contracts at issue. It provides examples of the benefits allegedly offered to Defendant McCabe, and of the acts Defendant McCabe allegedly performed or agreed to perform in exchange. If Defendants are again prosecuted for Honest Services Mail Fraud or Hobbs Act Extortion for their conduct between 1994 and 2016 for Defendant McCabe, or 2004 and 2016 for Defendant Boyle, they can point to this Indictment and establish they have already been prosecuted for that conduct.

It is nonsensical to contend that this Indictment is "not framed to apprise the defendant[s] with reasonable certainty, of the nature of the accusation[s] against [them] . . . ." *Id.* at 765 (quotation omitted). Nevertheless, Defendants rely upon *Russell* in arguing to the contrary, and assert that, as in that case, the Indictment fails to identify the "very core" of the offenses charged (*i.e.*, the precise nature of the agreement). *See* Mem. in Supp. at 10–11, ECF No. 45. Defendants' argument fails.

In *Russell*, the defendants were indicted for violating 2 U.S.C. § 192, which criminalizes refusing to answer questions when summoned to a hearing before Congress or a subcommittee. 369 U.S. at 752. The Supreme Court ruled that the indictment was insufficient because it did not identify the subject under inquiry at the subcommittee hearing, and because "there can be

criminality under the statute only if the question which the witness refused to answer pertained to a subject then under investigation by the congressional body which summoned him." *Id.* at 755.

This is not an instance where the *quid* or the *quo* are unknown, circumstances that would be comparable to *Russell*. As explained previously, for the *quo*, the Government need only allege that Defendant McCabe acted or agreed to act on a specific question or matter. The Indictment satisfies this requirement by identifying the food services and medical services contracts. The Fourth Circuit has ruled that facilitating the award of, and maintaining, government contracts qualifies as acting on a specific question or matter under *McDonnell*. *Conrad*, 760 F. App'x at 208. The Indictment also identifies numerous benefits—*quids*—allegedly offered or provided to Defendant McCabe, and numerous acts that Defendant McCabe allegedly took on the contracts.

Defendants' chief argument is that the *agreement* is not specified in the Indictment. But the Government has alleged in the Indictment that there was an agreement; and whether an agreement existed is a question of fact for the jury. *McDonnell*, 136 S. Ct. at 2371–72; *cf. Russell*, 369 U.S. at 755–56 (finding that "the question of pertinency is one for determination by the court as a matter of law"). Unlike the topic of a Senate Inquiry, which is a definite fact, whether an agreement existed can be proved by circumstantial evidence. *McDonnell*, 136 S. Ct. at 2371–72. An indictment need not set forth the entire universe of the Government's evidence. *United States v. Auto. Med. Labs., Inc.*, 770 F.2d 399, 405 (4th Cir. 1985) (finding that an indictment need not be supplemented by a bill of particulars "to provide detailed disclosure of the government's evidence in advance of trial").

In *Resendiz-Ponce*, the Supreme Court held that an indictment for illegally attempting to reenter the United States was sufficient, despite failing to allege a specific overt act that the defendant committed in seeking reentry, and despite the Government's burden to prove at trial "an

21

overt act qualifying as a substantial step toward completion." 549 U.S. at 107. The Supreme Court ruled that "[j]ust as it was enough for the indictment in *Hamling* to allege that the defendant mailed 'obscene' material in violation of 18 U.S.C. § 1461, it was enough for the indictment in [*Resendiz-Ponce*] to point to the relevant criminal statute and allege that 'on or about June 1, 2003,' [Resendiz-Ponce] 'attempted to enter the United States of America at or near San Luis in the District of Arizona.'" *Id.* at 107–08 (citing *Hamling*, 418 U.S. at 117–18). "[T]he use of the word 'attempt,' coupled with the specification of the time and place of the [defendant's] attempted illegal reentry," was sufficient to notify the defendant of the nature of the accusations against him. *Id.* at 108.

It is sufficient here, just as it was sufficient in both *Hamling* and *Resendiz-Ponce*, for the Indictment to point to the relevant criminal statute and allege that Defendant McCabe established illegal *quid pro quo* relationships with Conspirator #1 and Defendant Boyle regarding the food services contract and the medical services contracts. The Indictment identifies the contracts (*i.e.*, the specific question or matter), provides examples of the acts that Defendant McCabe took or agreed to take on those contracts, the time period of the schemes, categories of benefits and examples of specific benefits, and uses the phrase *quid pro quo*, "a term sufficiently definite in legal meaning to give a defendant notice of the charge against him." *Hamling*, 418 U.S. at 118. Although that alone would be sufficient, the Indictment goes well beyond this and describes in great detail the alleged *quid pro quo* relationships.

Therefore, the Indictment is sufficient regarding allegations of a *quid pro quo*. Defendants' Motions to Dismiss the Indictment for Failure to Allege a *Quid Pro Quo* (ECF Nos. 34, 44) are denied.

### C. Failure to Allege Explicit *Quid Pro Quo* for Campaign Contributions

Defendants' Motions to Dismiss Count 11 for failure to allege an *explicit quid pro quo* with respect to campaign contributions (ECF Nos. 39, 43) are also denied. The Government sufficiently alleges an explicit *quid pro quo*.

### i. *The Requirements of an Explicit Quid Pro Quo*

In *United States v. McCormick*, the United States Supreme Court observed that "in a case like this it is proper to inquire whether payments made to an elected official are in fact campaign contributions . . . ." 500 U.S. 257, 271 (1991). The applicable analysis changes when the alleged *quid* is a campaign contribution. *Id.* The Supreme Court reasoned:

> Serving constituents and supporting legislation that will benefit the [official's constituents] is the everyday business of [elected officials]. It is also true that campaigns must be run and financed. Money is constantly being solicited on behalf of candidates, who run on platforms and who claim support on the basis of their views and what they intend to do or have done. Whatever ethical considerations and appearances may indicate, to hold that [elected officials] commit the federal crime of extortion when they act for the benefit of constituents or support legislation furthering the interests of some of their constituents, shortly before or after campaign contributions are solicited and received from those beneficiaries, is an unrealistic assessment of what Congress could have meant by making it a crime to obtain property from another, with his consent, "under color of official right." To hold otherwise would open to prosecution not only conduct that has long been thought to be well within the law but also conduct that in a very real sense is unavoidable so long as election campaigns are financed by private contributions or expenditures . . . .

*Id.* at 272.

It is "not . . . impossible for an elected official to commit extortion in the course of financing an election campaign. Political contributions are of course vulnerable if . . . the payments are made in return for an explicit promise or undertaking by the official to perform or not perform an official act." *Id.* at 273.

However, "[t]he *McCormick* Court failed to clarify what it meant by 'explicit,' and subsequent courts have struggled to pin down the definition of an explicit *quid pro quo* . . . ." *United*

*States v. Ring*, 706 F.3d 460, 466 (D.C. Cir. 2013) (citing *United States v. McGregor*, 879 F. Supp. 2d 1308, 1313–20 (M.D. Ala. 2012) (collecting cases and navigating various courts' pronouncements about the meaning of "explicit")). At least two Courts of Appeals disagree on whether explicit means express. *Compare United States v. Ganim*, 510 F.3d 134, 143 (2d Cir. 2007) (finding that although "agreement may be implied from the official's words and actions" in the non-campaign context, "proof of an express promise is necessary when the payments are made in the form of campaign contributions") *with United States v. Carpenter*, 961 F.2d 824, 827 (9th Cir. 1992) (rejecting the argument that explicit means express, and holding that "what *McCormick* requires is that the *quid pro quo* be clear and unambiguous, leaving no uncertainty about the terms of the bargain"). Neither the Fourth Circuit nor the United States Supreme Court has taken up the issue.

The history of *McCormick* is informative. In *McCormick*, the Court of Appeals ruled that "payments to elected officials could violate the Hobbs Act without proof of an explicit *quid pro quo* by proving that the payments 'were never intended to be *legitimate* campaign contributions.'" *McCormick*, 500 U.S. at 271 (emphasis in original). According to the Court of Appeals, legitimate and impermissible campaign contributions were distinguishable based on the intent behind the contribution. If it were intended as a legitimate campaign contribution, neither the payor nor the official violated the Hobbs Act; if it were not intended as a legitimate campaign contribution, the jury could find the defendant guilty of violating the Hobbs Act. *Id.*

In overturning that ruling, the Supreme Court reasoned that it "cannot accept the Court of Appeals' approach to distinguishing between legal and illegal campaign contributions," and "*disagree[d] with the Court of Appeals' holding . . . that a quid pro quo is not necessary for conviction*

24

*under the Hobbs Act when an official receives a campaign contribution.*" *Id.* at 273 (emphasis

added).   Instead, the Supreme Court ruled that political contributions violate the Hobbs Act only

> if the payments are made in return for an explicit promise or undertaking by the
> official to perform or not perform an official act.  In such situations, the official
> asserts that his official conduct will be controlled by the terms of the promise or
> undertaking.  This is the receipt of money by an elected official under color of of-
> ficial right within the meaning of the Hobbs Act.

*Id.*  The Supreme Court merely overruled the lower court's ruling that the Government did not

need to establish a *quid pro quo* at all in the campaign contribution context.[4]

By concurrence in a later case, Justice Kennedy clarified that "[t]he official and the payor

need not state the *quid pro quo* in express terms, for otherwise, the law's effect could be frustrated

by knowing winks and nods.  The inducement from the official is criminal if it is express or if it is

implied from his words and actions, *so long as he intends it to be so and the payor so interprets

it.*"  *United States v. Evans*, 504 U.S. 255, 274 (1992) (J. Kennedy, concurring) (emphasis added).

Thus, what is required in the campaign contribution context, which is not required in the

context of other benefits, is that there be "a meeting of the minds on [the] *quid pro quo*." *Carpen-

ter*, 961 F.2d at 827.  As Justice Kennedy asserted, requiring a showing that the "official has spe-

cifically stated that he will exchange official action for a contribution . . . would allow officials to

escape liability under the Hobbs Act with winks and nods, even when the evidence as a whole

proves that there has been a meeting of the minds to exchange official action for money. . . .

[W]hat *McCormick* requires is that the *quid pro quo* be clear and unambiguous, leaving no uncer-

tainty about the terms of the bargain."  *Id.*  In other words, the *quid pro quo* is explicit "[w]hen a

contributor and an official clearly understand the terms of the bargain to exchange official action

---

[4] The Supreme Court stated: "McCormick's sole contention in this case is that the payments made
to him were campaign contributions.  Therefore, we do not decide whether a *quid pro quo* require-
ment exists [at all] in other contexts, such as when an elected official receives gifts, meals, travel
expenses, or other items of value."  *Id.* at 274 n.10.

for money .... The jury may consider both direct and circumstantial evidence, including the context in which a conversation took place, to determine if there was a meeting of the minds . . . ."[5] *Id.*

### ii. *The Indictment Adequately Alleges an Explicit Quid Pro Quo*

The Indictment adequately alleges an explicit *quid pro quo* because it alleges a meeting of the minds. Specifically, the Indictment states: "Throughout the course of the conspiracy, at McCabe's request and in furtherance of the scheme, Conspirator #1 provided substantial campaign contributions to McCabe. Conspirator #1 understood that McCabe would not use and continue to

---

[5] Defendants point to *United States v. Ganim* as a better authority for determining what it means for a *quid pro quo* to be explicit. 510 F.3d 134. In *Ganim*, then-Judge Sotomayor, writing for the Second Circuit, stated that "proof of an express promise is necessary when the payments are made in the form of campaign contributions." *Id.* at 142. Defendant's reliance on this authority is unpersuasive for two reasons. First, *Ganim* did not involve allegations that campaign contributions were bribes for official acts. The quote is therefore *dicta*.

Second, in making this pronouncement, the Second Circuit relied on a prior Second Circuit case that misread the factual background and holding of *Evans*. In that case, *United States v. Garcia*, the Second Circuit stated that "*Evans* modified the [*quid pro quo*] standard in *non-campaign contribution* cases by requiring that the government show only 'that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts.'" 992 F.2d 409, 414 (2d Cir. 1993) (emphasis added). This is inaccurate.

In *Evans*, the defendant asserted that the monetary payments he received *were* campaign contributions. 504 U.S. at 257. The question before the Court was whether, *in that context*, the official had to induce or demand the payment, rather than passively accept it. *Id.* at 268. The jury in *Evans* was instructed that "if a public official demands *or accepts* money in exchange for a specific requested exercise of his or her official power, such a demand *or acceptance* does constitute a violation of the Hobbs Act *regardless of whether the payment is made in the form of a campaign contribution.*" *Id.* at 258 (emphasis added) (alterations omitted).

The Supreme Court rejected the defendant's criticism of the jury instruction and "conclude[d] that it satisfies the *quid pro quo* requirement of *McCormick* . . . because the offense is completed at the time when the public official receives a payment in return for his agreement to perform specific official acts . . . ." *Id.* at 268. Thus, *in the context of campaign contributions*, the official need not take any "affirmative step[s]" to induce or demand payment; "the Government need only show that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts." *Id.*

Because the *Ganim* Court's statement about the standard in the campaign contribution context is *dicta*, and because it relies on a Second Circuit case that misinterprets the holding in *Evans*, Defendants' reliance on it is unpersuasive.

26

use Company A for food services at the Norfolk City Jail if Conspirator #1 did not provide such personal benefits." Indictment at 5, ECF No. 1. Similarly: "Throughout the conspiracy, Boyle was aware that he had to provide these things of value—including campaign contributions and in-kind political donations—to McCabe to maintain the medical services contract. McCabe sought campaign contributions and in-kind political donations from Defendant Boyle including during the years in which Defendant McCabe was not running for office." *Id.* at 9. In fact, with respect to the *quid pro quo* arrangement between Defendant Boyle and Defendant McCabe, the Indictment alleges that in October 2008, Defendant Boyle sent an email requesting campaign contributions to Defendant McCabe from two celebrities, at Defendant McCabe's request, commenting: "Celebrity is everything for some people I guess. That was his request and our contract is out to bid in January for a July renewal." *Id.*

The Indictment adequately alleges an explicit *quid pro quo* (*i.e.*, a meeting of the minds on the *quid pro quo*) because it alleges that all parties understood the terms of the bargain. "The jury may consider both direct and circumstantial evidence, including the context in which a conversation took place, to determine if there was a meeting of the minds." *Carpenter*, 961 F.2d at 827. The Government need not include all of this evidence in the Indictment. *Auto. Med. Labs., Inc.*, 770 F.2d at 405 (finding that an indictment need not be supplemented by a bill of particulars "to provide detailed disclosure of the government's evidence in advance of trial"). Defendants' Motions to Dismiss Count 11 for failure to allege an explicit *quid pro quo* (ECF Nos. 39, 42) are denied.

### D.   Conspiracy to Commit Money Laundering

Although Defendants' Motions to Dismiss Count 11 for failure to allege an explicit *quid pro quo* are denied (*see supra*, at § II.C), Defendant Boyle's Motion to Dismiss Count 11 (ECF

27

No. 42) is **GRANTED in part** on the grounds that the bribe payment was not separate and distinct from Defendant Boyle's involvement in the money laundering conspiracy. However, Defendant McCabe's Motion to Dismiss Count 11 for failure to identify criminal proceeds (ECF No. 39) is **DENIED.**

### i.    Elements of the Offense

Defendants are charged in Count 11 with Conspiracy to Commit Money Laundering in violation of 18 U.S.C. § 1956(h). The statute criminalizes conspiracies to commit any offense defined in 18 U.S.C. § 1956 or 1957. *Id.* The Indictment alleges that Defendants conspired to violate 18 U.S.C. § 1956(a)(1)(B)(i), which provides that it is an offense to "conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity . . . ." The definition of "specified unlawful activity" includes "any act or activity constituting an offense listed in section 1961(1) of this title." 18 U.S.C. § 1956(c)(7)(A). This list includes 18 U.S.C. § 1341. *See* 18 U.S.C. § 1961(1) (listing "section 1341 (relating to mail fraud)"). Defendants have been charged in other Counts of this Indictment with violating 18 U.S.C. § 1341 (Counts 3–7 for Defendant McCabe and Counts 5–7 for Defendant Boyle).

The elements of conspiracy to commit money laundering are: that "(1) an agreement to commit money laundering existed between [two] or more persons; (2) the defendant knew that the money laundering proceeds have been derived from illegal activity; and (3) the defendant knowingly and voluntarily became part of the conspiracy." *United States v. Singh*, 518 F.3d 236, 248 (4th Cir. 2008) (citations omitted). "Funds are 'criminally derived' if they are derived from an already completed offense, or a completed phase of an ongoing offense. . . . Put plainly, the laundering of funds cannot occur in the same transaction through which those funds first become tainted by crime." *United States v. Butler*, 211 F.3d 826, 829–30 (4th Cir. 2000). "Thus, the key

28

inquiry is . . . whether the specified unlawful activity"—or phase thereof—"generated proceeds prior to the money laundering . . . ." *United States v. Bolden*, 325 F.3d 471, 488 (4th Cir. 2003).

       *ii.*    *Defendant McCabe*

Defendant McCabe argues that "there is no evidence or allegation in the Indictment as to the illegal nature of the source of the funds used by Mr. Boyle to satisfy the check." Mem. in Supp. Mot. to Dismiss Count 11 at 1, ECF No. 40.

The crux of this argument is that there is no evidence or allegation that Defendant Boyle possessed $12,500 in his bank account—to later give to Defendant McCabe—as a result of illegal activity. Mem. in Supp. at 1, ECF No. 40. However, Defendant McCabe provides no legal support for the argument that "proceeds" has such a limited definition.

The Indictment alleges clearly that Defendant McCabe "knowingly conduct[ed] and attempt[ed] to conduct financial transactions . . . which . . . involved the proceeds of specified unlawful activity, *that is, honest services mail fraud,* knowing that the transactions were designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, and . . . kn[owing] that the property involved in the financial transactions represented the proceeds of some form of unlawful activity . . . ." Indictment at 28, ECF No. 1 (emphasis added).

Count 11 of the Indictment alleges that "McCabe, Boyle, and Conspirator #2 transferred the funds through various financial accounts to conceal their bribery relationship . . . ." *Id.* at 29. It incorporates the General Allegations section of the Indictment by reference (*id.* at 28), which alleges that the $12,500 check was given by Defendant Boyle to Defendant McCabe as one of many benefits in their *quid pro quo* relationship regarding CCS's contract with the City of Norfolk. *Id.* at 13–14.

The $12,500 became the "proceeds" of illegal activity—in this case, Honest Services Mail Fraud, in violation of 18 U.S.C. § 1341—when Defendant Boyle allegedly offered the payment to Defendant McCabe in exchange for official acts. All elements of the offense are alleged in the Indictment. Defendant McCabe's Motion to Dismiss Count 11 (ECF No. 39) is denied.

> iii.    Defendant Boyle

Defendant Boyle argues that Count 11 fails to state an offense as to his conduct because the alleged bribe payment (*i.e.*, the "proceeds") serving as the basis for the money laundering conspiracy charge "was not prior, separate, and distinct criminal activity from the alleged money laundering." Mem. in Supp. Mot. to Dismiss Count 11 at 14, ECF No. 43. Defendant Boyle is correct. Count 11 is dismissed as to Defendant Boyle.

> In addressing this issue previously, the Fourth Circuit held:
>
> Congress passed the money laundering statutes to criminalize the means criminals use to clean their ill-gotten gains. In other words, Congress did not fashion the money laundering statute to create a new source of criminal liability for every fraudulent monetary transaction. Rather, both the plain language of § 1957 and the legislative history behind it suggest that Congress targeted only those transactions occurring after proceeds have been obtained from the underlying unlawful activity.
>
> *Butler*, 211 F.3d at 829 (quotations omitted).

Here, the proceeds were obtained from the underlying criminal activity—that is, the money was first "tainted by crime" (*Butler*, 211 F.3d at 829)—when Defendant Boyle offered the bribe payment to Defendant McCabe in exchange for official acts. *See Sun-Diamond Growers of Cal.*, 526 U.S. at 404–05 (finding that establishing *quid pro quo* for the payor requires a showing that the defendant had the "specific intent to give . . . something of value in exchange for an official act"). The Indictment alleges that: "On or about April 15, 2016, Boyle . . . wrote a personal check for $12,500, left the 'Pay to the order of' line blank, wrote consulting in the memo line, and gave the check to McCabe." Indictment at 13, ECF No. 1. This single transaction serves as the basis

for the Honest Services Mail Fraud offense that renders the $12,500 proceeds of criminal activity, *and* as the basis for Defendant Boyle's role in the money laundering offense.

There is no allegation in the Indictment that Defendant Boyle directed Conspirator #2 to deposit the check into his own account and to funnel the money to Defendant McCabe's campaign fund through multiple straw donors. *Cf. United States v. Mariano*, Crim. No. 05-614, 2006 WL 487905, at *5 (E.D. Pa. Feb. 27, 2006) (finding the payors properly convicted of money laundering where "the indictment charges that the [payors] *and* [the official] caused the third parties to deposit the . . . checks, or bribe proceeds, into their bank accounts and then to write a personal check in order to obtain a bank check made payable to [the official's] credit card companies").

The offenses, insofar as they relate to Defendant Boyle, occurred concurrently. "[T]he laundering of funds" occurred "in the same transaction through which those funds first bec[ame] tainted by crime." *Butler*, 211 F.3d at 829; *cf. Bolden*, 325 F.3d at 488 (affirming the money laundering convictions because "the fraud scheme produced proceeds through the prospective payments prior to the financial transactions . . . on which the money laundering convictions were based"). Therefore, Count 11 is insufficient as it pertains to Defendant Boyle, and his Motion to Dismiss Count 11 (ECF No. 42) is granted. [6]

---

[6] Although Defendant McCabe never advanced this argument, the Court clarifies that this analysis does not apply to him. The mail fraud offense was completed on Defendant McCabe's part when he allegedly accepted the bribe by taking the check into his possession. He then allegedly engaged in separate and subsequent financial transactions—directing a third party to write his own name on the check, to deposit it into his account, after which several individuals and companies made smaller contributions to Defendant McCabe's campaign fund, which were then reimbursed by the third party—to conceal the source of the funds. Indictment at 13–14, 28–29, ECF No. 1. This does not present a problem under the "separate transaction" requirement of the money laundering statute. *See Mariano*, 2006 WL 487905, at *5 (finding the indictment validly charged defendants with money laundering because "the honest services fraud offenses were legally completed or at a completed phase of an ongoing offense when the [payors] offered a bribe to [defendant] with the intent to influence his official actions" and the defendant then "caused the third parties to deposit the . . . checks, or bribe proceeds, into their bank accounts and then to write a personal check in

### iv.    Merger

"[I]n the case of a money laundering statute criminalizing financial transactions involving the 'proceeds' of an illegal activity, a merger problem can occur if a person is convicted [of money laundering] 'for paying the 'essential expenses of operating' the underlying crime." *United States v. Abdulwahab*, 715 F.3d 521, 530 (4th Cir. 2013) (citing *United States v. Halstead*, 634 F.3d 270, 279 (4th Cir. 2011) (quoting *United States v. Santos*, 553 U.S. 507, 528 (2008))).

The Fourth Circuit confronted this issue in *Halstead*. 634 F.3d 270. In that case, the defendant was engaged in insurance fraud. *Id.* at 272–73. Under the scheme, the defendant opened clinics and fraudulently billed insurance companies through those clinics. *Id.* After the clinic received payment on the fraudulent bill, the money was transferred by the clinic to the defendant's checking account. *Id.* at 273. The Fourth Circuit found no merger problem because the fraud was complete once the insurance company made payment on the fraudulent bill. *Id.* at 280. The money laundering offenses were based on separate financial transactions involving the proceeds of the fraud. *Id.* at 280–81.

In contrast, in *United States v. Cloud*, the Fourth Circuit found improper merger. 680 F.3d 396 (4th Cir. 2012). The defendant operated a real estate investment scheme. *Id.* at 399–400. His scheme involved multiple misrepresentations to buyers, the falsification of loan applications, and the payment of kickbacks to several individuals. *Id.* The defendant was convicted of money laundering on the basis of payments made "to recruiters, buyers, and other coconspirators for the role each person played in the mortgage fraud scheme." *Id.* at 406. This created a merger problem because "it was only through the promise of these payments that [the defendant] was able to

---

order to obtain a bank check made payable to [defendant's] credit card companies . . . ." (citations omitted).

persuade his coconspirators to" engage in the fraud with him. *Abdulwahab*, 715 F.3d at 531 (citing *Cloud*, 680 F.3d at 406–08).

The Court need not address Defendant Boyle's argument on merger to dispense with his Motion to Dismiss Count 11. *See supra*. However, to the extent that Defendant McCabe intended to rely on his co-defendant's argument, the Court finds that there is no merger problem, and therefore no reason to dismiss Count 11 as to Defendant McCabe.

Defendant McCabe's alleged money laundering did not involve paying the essential expenses of the underlying crime of Honest Services Mail Fraud. Defendant McCabe was not using the proceeds of the crime to provide kickbacks or payments to co-conspirators in the underlying offense. The financial transactions were not necessary to persuade Defendant McCabe's co-conspirators to engage in bribery with him. Rather, like the defendant in *Halstead*, Defendant McCabe was allegedly engaging in separate financial transactions with the proceeds of Honest Services Mail Fraud to conceal the source of the funds. Thus, there is no merger problem as to Defendant McCabe.

## III. MOTION TO STRIKE REFERENCES TO CAMPAIGN CONTRIBUTIONS

Under Federal Rule of Criminal Procedure 7(d), "[u]pon the defendant's motion, the court may strike surplusage from the indictment or information." "The purpose of Rule 7(d) is to protect a defendant against prejudicial allegations that are neither relevant nor material to the charges made in an indictment, or not essential to the charge, or unnecessary, or inflammatory." *United States v. Poore*, 594 F.2d 39, 41 (4th Cir. 1979) (citations omitted).

Defendants move to strike all reference to campaign contributions or campaign finance reporting requirements from the Indictment because the Government has failed to adequately allege an explicit *quid pro quo*. Defendants' Motions to Dismiss for failure to adequately allege an

explicit *quid pro quo* relationship are denied. *See supra* at II.C. Allegations of campaign contri-
butions and in-kind political donations are relevant to the charges in the Indictment. The Govern-
ment's theory of the case is that these contributions were offered as "*quids*" in a *quid pro quo*
relationship. Allegations regarding reporting requirements are also relevant to the charges in the
Indictment because they serve as circumstantial evidence that these payments were offered and
accepted as bribes, and because they are probative of Defendant McCabe's alleged intent to de-
prive the citizens of Norfolk of his honest services. *See United States v. Beverly*, 284 F. App'x 36,
40 (4th Cir. 2008) (stating that "intent can be inferred from efforts to conceal the unlawful activity,
[and] from misrepresentations" (quotations omitted)). Defendant McCabe's and Defendant
Boyle's Motions to Strike References to Campaign Contributions from the Indictment (ECF Nos.
38, 42) are denied.

## IV.    BILL OF PARTICULARS

Defendants' requests for a bill of particulars (ECF Nos. 35, 45) are **DENIED**.

### A.    Legal Standard

Under Federal Rule of Criminal Procedure 7(f), a defendant may move for a bill of partic-
ulars. "Granting or denying a motion for a bill of particulars is a matter within the sound discretion
of the trial court . . . ." *United States v. Dulin*, 410 F.2d 363, 364 (4th Cir. 1969). A bill of
particulars serves to enable a defendant "to prepare for trial, avoid or minimize the danger of sur-
prise at time of trial[,] and . . . to plead his acquittal or conviction in bar of another prosecution for
the same offense." *Id.*

> [T]he fact that an indictment . . . conforms to the simple form suggested in [the
> Federal Rules of Criminal Procedure] is no answer or defense to a motion for a bill
> of particulars . . . . Rule 7(f) necessarily presupposes an indictment good against a
> motion to quash or a demurrer. Its proper office is to furnish to the defendant *fur-*
> *ther information* respecting the charge stated in the indictment when necessary to
> the preparation of his defense . . . .

*United States v. Smith*, 16 F.R.D. 372, 374–75 (W.D. Mo. 1954) (emphasis in original); *accord* Fed. R. Crim. P. 7(f) advisory committee note to 1966 amendment (citing *Smith*, 16 F.R.D. 372, written by Justice Whittaker as a district judge, as "an illustration of wise use of" the discretion afforded to courts under this Rule).

However, "[a] bill of particulars is not to be used to provide detailed disclosure of the government's evidence in advance of trial." *Auto. Med. Labs., Inc.*, 770 F.2d at 405; *see also United States v. Robinson*, 956 F.2d 1163, at *1 (4th Cir. 1992) (Table) (stating that it is "not the purpose of a bill of particulars" to provide a defendant with the "specific evidence to be used by the government at trial" (citation omitted)).

### B.    Analysis

Defendants' requests for a bill of particulars are denied.  The Indictment is sufficiently detailed to allow Defendants "to prepare for trial, avoid or minimize the danger of surprise at time of trial and . . . to plead . . . acquittal or conviction in bar of another prosecution for the same offense." *Dulin*, 410 F.2d at 364.

Defendants essentially seek the disclosure of the Government's evidence that an agreement existed.  As discussed previously (*see supra* at II.B), whether an agreement existed can be proved by a broad range of both direct and circumstantial evidence. *McDonnell*, 136 S. Ct. at 2371–72. This is true even where proof of an explicit *quid pro quo* is required. *Carpenter*, 961 F.2d at 827; *see supra* at II.C.

The parties have entered into agreed discovery orders.  Agreed Discovery Orders, ECF Nos. 27, 31.  The Government represents, and Defendants do not dispute, that the Government "has already provided defense counsel with substantial discovery material, and has even gone beyond its discovery obligation by including summaries of the interviews conducted by law

enforcement agents of numerous potential government witnesses . . . ." Gov't Resp. in Opp. at 46, ECF No. 49. The Government further asserts that "[a]t trial, [it] will not introduce a single document that it has not produced in advance to defense counsel for inspection and/or copying." *Id.* Defendants have cast no real doubt on these representations.

This Indictment does far more than "conform[] to the simple form suggested in [the Federal Rules of Criminal Procedure]." *Smith*, 16 F.R.D. at 374–75. It contains detailed allegations. Defendants are ensured that they will obtain the remaining evidence in the case before trial through discovery, as provided in the agreed discovery orders. No bill of particulars is needed under these circumstances.

## V.     **MOTION *IN LIMINE***

Defendant McCabe moves to exclude from evidence at trial any allegation or evidence: (1) "that the Defendant cashed campaign contribution checks for his personal benefit and then lied on his campaign filings;" or (2) of Defendant's "failure to accurately report information on the campaign finance disclosure reports." Mot. to Exclude, ECF No. 37. Defendant brings this Motion under Federal Rules of Criminal Procedure 403 and 404(b). *Id.* Defendant McCabe's Motion *in Limine* (ECF No. 37) is denied.

### A.     **Rule 403**

Under Federal Rule of Evidence 403, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice . . . ." "[W]hat counts as the Rule 403 'probative value' of an item of evidence, as distinct from its Rule 401 'relevance,' may be calculated by comparing evidentiary alternatives." *Old Chief v. United States*, 519 U.S. 172, 184 (1997). "Although the availability of other evidence . . . may be a factor, it does not compel the exclusion of evidence under Rule 403." *Id.*

"The term 'unfair prejudice,' as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." *Id.* at 180. The fact that evidence is prejudicial is insufficient. "Most relevant evidence is, by its very nature, prejudicial." *United States v. Hanna*, 630 F.3d 505, 511 (7th Cir. 2010) (quotation omitted). It must be "*unfairly* prejudicial to require exclusion." *Id.* (emphasis in original). "[A] court does not abuse its discretion by refusing to exclude such evidence . . . unless there is a 'genuine risk that the emotions of the jury will be excited to irrational behavior, and that this risk is disproportionate to the probative value of the offered evidence.'" *United States v. Forrest*, 429 F.3d 73, 79–80 (4th Cir. 2005) (quoting *United States v. Ham*, 998 F.2d 1247, 1252 (4th Cir. 1993)).

Federal Rule of Evidence 401 provides that evidence is relevant if: "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." This evidence is clearly relevant. Defendant McCabe has been charged with Honest Services Mail Fraud, in violation of 18 U.S.C. § 1341, and Conspiracy to Commit Honest Services Mail Fraud, in violation of 18 U.S.C. § 1349. The campaign contributions themselves are the alleged *quids* in those offenses. Evidence of those contributions are therefore relevant and probative.

As for the campaign filings and disclosure reports, an element of Honest Services Mail Fraud is "that the defendant knowingly and willfully participated in the scheme or artifice to defraud, with knowledge of its fraudulent nature and with specific intent to defraud." *See* Sand, *et al.*, Modern Federal Jury Instructions, Vol. 2, ¶ 44.01, Instruction 44-3 (2019) (stating elements of mail fraud); *see also United States v. Pitt*, 482 F. App'x 787, 790 (4th Cir. 2012) ("[T]he Government must prove that the defendants acted with the specific intent to defraud . . . ."). Intent to

37

defraud "means to act knowingly and with specific intent to deceive, for the purposes of causing some financial property loss to another." *See* Sand, *et al.*, Modern Federal Jury Instructions, Vol. 2, ¶ 44.01, Instruction at 44-5 (2019). The intent to defraud "'may be inferred from the totality of the circumstances and need not be proved by direct evidence.' Fraud includes 'acts taken to conceal, create a false impression, mislead, or otherwise deceive in order to prevent the other [party] from acquiring material information.'" *Pitt,* 482 F. App'x at 790 (quoting *United States v. Godwin*, 272 F.3d 659, 666 (4th Cir. 2001); and *United States v. Colton*, 231 F.3d 890, 989 (4th Cir. 2000)). McCabe's alleged efforts to conceal campaign contributions bear on his alleged intent to defraud and are clearly relevant to and probative of the offenses charged.

Relevant evidence may be excluded only if its probative value is outweighed by the danger of *unfair* prejudice. Relevant evidence in a criminal case is generally prejudicial. *Hanna*, 630 F.3d at 511. Defendant McCabe's Motion *in Limine* consists of a single page, and asserts only "that inherent prejudice would result from introduction of such evidence . . . ." Defendant McCabe has not explained why such evidence is inherently prejudicial, and it is not clear to this Court why it would be. Nothing indicates that the introduction of this evidence will create "a genuine risk that the emotions of a jury will be excited to irrational behavior . . . ." *United States v. Udeozor*, 515 F.3d 260, 264 (4th Cir. 2008).

The challenged evidence is not excludable under Rule 403. This evidence is relevant to and probative of the offenses charged, and its probative value is not outweighed by the danger of unfair prejudice. The probative value of this evidence is not clearly outweighed by the danger of unfair prejudice. The Court turns to whether this evidence must be excluded under Rule 404(b).

## B.    Rule 404

Under Federal Rule of Criminal Procedure 404(b), "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." However, "[t]his evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."

"Evidence of uncharged conduct is not 'other crimes' evidence subject to Rule 404 if the uncharged conduct 'arose out of the same series of transactions as the charged offense, or if evidence of the uncharged conduct is necessary to complete the story of the crime on trial." *United States v. Siegel*, 536 F.3d 306, 316 (4th Cir. 2008). Evidence of bad acts that "provide context relevant to the criminal charges"—*res gestae* evidence—is admissible without considering the requirements of Rule 404. *United States v. Cooper*, 482 F.3d 658, 663 (4th Cir. 2007).

Even where evidence may not be admissible as intrinsic *res gestae* evidence, it is not necessarily excluded under Rule 404. "Rule 404(b) prohibits evidence of other crimes or bad acts *to show bad character or propensity to break the law*." *Siegel*, 536 F.3d at 316 (emphasis added). But evidence of other crimes may be

> admissible for other purposes, which include, but are not limited to, proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. Rule 404(b) is viewed as an inclusive rule, admitting all evidence of other crimes or acts except that which tends to prove *only* criminal disposition. To be admissible under Rule 404(b), evidence must be (1) relevant to an issue other than character; (2) necessary; and (3) reliable.

*Id.* at 317 (quotations omitted).

To be relevant for purposes of Rule 404(b), "evidence need only to have any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *United States v. Aramony*, 88

39

F.3d 1369, 1377 (4th Cir. 1996) (quotations omitted). Such relevant evidence is considered necessary under Rule 404(b) "if it is an essential part of the crimes on trial, or where it furnishes part of the context of the crime." *Siegel*, 536 F.3d at 316. And it is reliable "unless it is so preposterous that it could not be believed by a rational and properly instructed juror." *Id.*

As an initial matter, the evidence to which Defendant McCabe objects is not evidence of uncharged conduct. The campaign contributions are part of the charges of Honest Services Mail Fraud, in violation of 18 U.S.C. § 1341, of Conspiracy to Commit Honest Services Mail Fraud, in violation of 18 U.S.C. § 1349, and of Hobbs Act Extortion, in violation of 18 U.S.C. § 1951. These contributions are some of the alleged *quids*. Evidence of Defendant McCabe cashing these checks, and his failure to disclose the contributions in campaign filings and finance disclosure reports is evidence of an element of the offense of Honest Services Mail Fraud: Defendant McCabe's intent to defraud. This evidence is part of the charged conduct.

Even if the evidence were evidence of uncharged conduct, it would be *res gestae* evidence not subject to the limitations of Rule 404(b). The evidence provides context and completes the story of the crime on trial. It shows what Defendant McCabe did with those campaign contributions after he received them.

Similarly, even if this evidence were evidence of uncharged conduct and *not res gestae* evidence, it would still be admissible under Rule 404(b). The evidence is, as recognized above, relevant. The evidence is necessary, as it goes to an element of the offenses, which is undoubtedly "an essential part of the crimes on trial . . . ." *Siegel*, 536 F.3d at 316. There is no showing that this evidence is unreliable. The Motion lacks legal support and argument, and Defendant McCabe filed no reply brief in support of the Motion. Defendant McCabe's Motion *in Limine* (ECF No. 37) is denied.

## VI.   MOTION TO SEVER

Defendant Boyle's Motion to Sever (ECF No. 46) is **GRANTED**.

### A.   Legal Standard

Federal Rule of Criminal Procedure 8 permits the joinder of offenses and defendants. Rule 8 is "designed to promote economy and efficiency and to avoid a multiplicity of trials, [so long as] these objectives can be achieved without substantial prejudice to the right of the defendants of a fair trial." *Zafiro v. United States*, 506 U.S. 534, 540 (1993) (quotations omitted).

Under Rule 8(a), offenses may be joined against a single defendant where the offenses charged "are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." Fed. R. Crim. P. 8(a); *see United States v. McLaurin*, 764 F.3d 372, 385, 387 (4th Cir. 2014). The Fourth Circuit has interpreted this standard "flexibly, requiring that the joined offenses have a 'logical relationship' to one another." *United States v. Cardwell*, 433 F.3d 378, 385 (4th Cir. 2005) (citation omitted). "Rule 8(a) 'permit[s] very broad joinder' because of the efficiency in trying the defendant on related counts in the same trial." *Id.* (quoting *United States v. Mackins*, 315 F.3d 399, 412 (4th Cir. 2003)).

However, "[i]t is firmly established in the case law that the propriety of joinder in cases where there are multiple defendants must be tested by Rule 8(b) alone and that Rule 8(a) has no application." *United States v. Jackson*, 562 F.2d 789, 794 (D.C. Cir. 1977); *see also* 1A Fed. Prac. & Proc. Crim § 144 (5th ed.) ("Federal Rule of Criminal Procedure 8(a) describes when it is permissible to join more than one count in a single indictment or information. The conventional wisdom is that this subsection applies only to the prosecution of a single defendant; if more than one defendant is involved, Rule 8(b) states the test for joinder."). Accordingly, the similarity of the offenses is not relevant here.

Where, as here, "more than one defendant is named in an indictment, the provisions of Rule 8(b) control." *United States v. Satterfield*, 548 F.2d 1341, 1344 (9th Cir. 1977). Under Rule 8(b), an indictment may jointly charge more than one defendant "if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense. The defendants may be charged in one or more counts together or separately. All defendants need not be charged in each count." Fed. R. Crim. P. 8(b).

"Separate acts constituting separate offenses are sufficiently related to be within the same series if they arise out of a common plan or scheme." *United States v. Haney*, 914 F.2d 602, 606 (4th Cir. 1990) (quoting *United States v. Porter*, 821 F.2d 968, 972 (4th Cir. 1987)). "There must be a series of acts unified by some substantial identity of facts or participants." *Porter*, 821 F.2d at 972.

Where one defendant is "engaging in a continuing enterprise based on a series of crimes, including those involving the other [defendants], joinder [is] proper under Rule 8(b)." *Porter*, 821 F.2d at 972. "[I]t is not necessary . . . to show that each defendant participated in every transaction in the series." *United States v. Santoni*, 585 F.2d 667, 673 (4th Cir. 1978).

But "[w]here the only nexus between two defendants joined for trial is their participation in similar offenses, on different dates, with a [single] common . . . defendant, the 'same transaction' or 'series of transactions' test of Rule 8(b) is not satisfied and joinder is impermissible." *United States v. Whitehead*, 539 F.2d 1023, 1026 (4th Cir. 1976); *see also United States v. Kaplan*, 588 F.2d 71, 74 (4th Cir. 1978) ("If the indictment consists of several counts, the defendants are properly joined under this Rule only if all arise out of the same act or transactions or series of acts or transactions, and this is true even though all counts may include a common defendant.").

42

"The joinder of defendants and offenses totally unconnected is prohibited by Rule 8(b). This is not a matter of discretion . . . ." *United States v. Chinchic*, 655 F.2d 547, 550 (4th Cir. 1981) (quoting *Ingram v. United States*, 272 F.2d 567, 569 (4th Cir. 1959)).

## B.    Analysis

Defendants have been joined improperly in this Indictment.  Counts 2, 5, 6, 7, and 9 allege that Defendant Boyle offered benefits to Defendant McCabe and that, in exchange, Defendant McCabe performed or agreed to perform official acts for the benefit of CCS's medical services contract, or that the two conspired to do so.  Indictment, ECF No. 1.  Counts 1, 3, 4, and 8 allege that Conspirator #1 offered benefits to Defendant McCabe and that, in exchange, Defendant McCabe performed or agreed to perform official acts for the benefit of Company A's food services contract, or that the two conspired to do so.  *Id.*

These transactions are separate, occurred at largely different times, are factually distinct— apart from Defendant McCabe's involvement—and there is no allegation that they are part of a series or a continuing enterprise, or that all participants had a common goal.  Nothing indicates that Defendant Boyle was aware of the bribery relationship between Defendant McCabe and Conspirator #1.  The Fourth Circuit has held clearly that joinder is improper under these circumstances. *Chinchic*, 655 F.2d at 551 (finding misjoinder where two burglaries were separate and unrelated transactions but had several common defendants).

The Government asserts that *Chinchic* is inapplicable because this case differs in an important respect: the Government has charged McCabe with "Hobbs Act extortion based on conduct relating to both schemes" (Count 10).  Gov't. Resp. in Opp. at 53, ECF No. 49.[7]  The Government

---

[7] The Government also argues that this case differs from *Chinchic* because "the offenses . . . were long-term schemes involving the same modalities—years of illicit payments, official acts, and subterfuge.  Thus, the similarities between the food-services scheme and the medical services

43

argues that, as such, this Court should rely instead on "*Welch, Whitfield*, and *Stillo*" (*id.*), the three authorities addressed below. The Government mischaracterizes the holdings of these cases.

In *United States v. Welch*, there were four defendants: (1) Welch, (2) Cashell, (3) Satterwhite, and (4) Cochran. 656 F. 2d 1039 (5th Cir. 1981). Count III charged Welch, Satterwhite, and Cochran with a conspiracy to obstruct the enforcement of the criminal laws of the State of Texas with the intent to facilitate an illegal gambling business in violation of 18 U.S.C. § 1511. *Id.* at 1047. This count was based on a gambling operation run by a man named Raymond Cantrell at Foster Farms. *Id.* at 1044. Count IV charged Welch and Cashell with a conspiracy to obstruct the enforcement of the criminal laws of the State of Texas with the intent to facilitate an illegal gambling business in violation of 18 U.S.C. § 1511. *Id.* at 1045. This count was based on an entirely separate gambling operation being run at the local fairground. *Id.*

Count V charged all four defendants with conducting and participating in the conduct and affairs of an enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c). *Id.* Count III served as one of the predicate acts underlying the substantive RICO charge against Welch, Satterwhite, and Cochran. *Id.* at 1048. Count IV served as one of the predicate acts underlying the substantive RICO charge against Welch and Cashell. *Id.* The defendants challenged the joinder of Counts III and IV. *Id.* at 1048–49.

The Court of Appeals for the Fifth Circuit ruled that joinder was appropriate under Rule 8(b). The Fifth Circuit did not, as the Government contends, rule that joinder was appropriate merely because an overarching charge was based on the conduct alleged in Counts III and IV. The

---

scheme here are more pronounced than the similarities between the two burglaries in *Chinchic*." *Id.* The applicable standard here is Rule 8(b), which requires the defendants to have been engaged in the *same series* of acts or transactions. The similarity of offenses is only relevant under Rule 8(a). This argument is rejected.

Fifth Circuit's holding was much narrower: "When otherwise separate offenses are charged as predicate act of a substantive RICO count, . . . [the] substantive RICO count can provide an overall connection that will allow the joinder of seemingly unrelated acts." *Id.* at 1051.

The Fifth Circuit reasoned that "[i]ncluding both [separate and distinct gambling schemes] as predicate acts under the substantive RICO count *served as an allegation that the purpose of both conspiracies was to conduct the affairs of the Sheriff's Office through a pattern of racketeering activity*." 656 F.2d at 1050–51 (emphasis added). In other words, "RICO permits the inference of a common objective from the commission of diverse crimes by apparently unrelated individuals . . . . [T]he enterprise supplies a unifying link between all the predicate acts charged, since all the predicate acts must be committed in the conduct of the affairs of the enterprise." *Id.* at 1051–52 (citation omitted). The *shared goal* of furthering the enterprise made the two otherwise unrelated gambling operations part of the same series of acts or transactions. *Id.*

The same is true of *United States v. Whitfield*, 590 F.3d 325, 355 (5th Cir. 2009) ("Whitfield and Teel were charged for their participation in two separate bribery schemes linked only by Minor's involvement in both. However, as was the case in *Welch* . . . , the bribery and wire fraud charges involving Whitfield and Teel *constituted the predicate acts underlying the substantive RICO count brought against Minor*. Therefore, we conclude that appellants were properly joined.").

The overarching charge in *United States v. Stillo* was also a RICO charge. 57 F.3d 553 (7th Cir. 1995). The same distinctions in the *Welch* and *Whitfield* decisions apply to *Stillo* as well.

In this case, there is no common goal alleged in the Indictment, nor an enterprise that permits the Court to infer a common goal. *Cf. Welch*, 656 F.2d at 1052 (ruling that "[e]ach conspiracy charged by Counts III and IV constituted one of the predicate crimes. *Thus, each conspiracy was*

45

aimed at participating in the affairs of the enterprise. The acts directed at conducting the affairs *[of the enterprise] were related to each other and were part of a series of acts or transactions.*" (emphasis added)). Nothing connects the McCabe-Conspirator #1 scheme to the McCabe-Boyle scheme, other than Defendant McCabe himself.

As the *Stillo* Court observed: "The government cannot bootstrap multiple defendants with similar but unconnected offenses into a single indictment by combining Rule 8(a) and 8(b) and the existence of overlapping defendants."[8]  57 F.3d at 557.  That is precisely what the Government has done here.  It properly joined Defendant McCabe and Defendant Boyle in Counts 2, 5, 6, 7, and 9 under Rule 8(b).  It then improperly attempts to bootstrap Counts 1, 3, 4, and 8 to the same Indictment under Rule 8(a) based on the similarity of the offenses, and attempts to conceal this bootstrapping by arguing that Count 10 is based on a continuing course of conduct that is covered by all nine other counts.  This is insufficient to render the two separate transactions part of a series. Count 10 does not imply that Boyle and Conspirator #1 shared any common goal or purpose.

"This is not an instance where one criminal activity naturally flows from separate criminal conduct.  Nor is this an instance where all the criminal activities logically fall under the umbrella of one big conspiracy."  *United States v. Sarkisian*, 197 F.3d 966, 976 (9th Cir. 1999) (citations omitted).  There is no "substantial overlap" in the evidence presented for the counts involving the McCabe-Conspirator #1 scheme and the counts involving the McCabe-Boyle scheme.  But for Count 10, there would be absolutely no reason to try these two conspiracies together.  Charging

---

[8] *See also Cupo v. United States*, 359 F.2d 990, 993 (D.C. Cir. 1966) ("When similar but unrelated offenses are jointly charged to a single defendant, some prejudice almost necessarily results, and the same is true when several defendants are jointly charged with a single offense or related offenses.  Rule 8(a) permits the first sort of prejudice and Rule 8(b) the second.  But the rules *do not permit cumulation of prejudice* by charging *several* defendants with *similar but unrelated* offenses." (emphasis added)).

Defendant McCabe with a continuous course of conduct does not transform these separate schemes into a common one. It would be inappropriate to subvert the limitations of Rule 8 in such a manner. Accordingly, the counts must be severed.

The parties are **ORDERED** to confer and to file a joint status report no later than seven days from the date of this Order advising the Court how these counts should be severed. That is, the parties should advise the Court whether Defendant McCabe and Defendant Boyle ought to be tried together on Counts 2, 5, 6, 7, and 9, and Defendant McCabe tried alone on Count 1, 3, 4, 8, 10 and 11, or whether Defendant McCabe and Defendant Boyle should be tried separately on all counts. The parties should also advise the Court which Defendant(s) and which Counts will be tried on the May 27, 2020 trial date.

## VII.    CONCLUSION

For the foregoing reasons, Defendant McCabe's and Defendant Boyle's Motions to Dismiss the Indictment for Failure to Allege a *Quid Pro Quo* (ECF Nos. 34, 44) are **DENIED**; Defendant McCabe's Motion to Dismiss Count 11 for Failure to State the Offense (ECF No. 39) is **DENIED**; Defendant Boyle's Motion to Dismiss Count 11 for Failure to State the Offense and to Strike References to Campaign Contributions from the Indictment (ECF No. 42) is **GRANTED in part** and **DENIED in part** (Count 11 is **DISMISSED as to Defendant Boyle**); Defendant McCabe's Motion to Strike References to Campaign Contributions from the Indictment (ECF No. 38) is **DENIED**; Defendant McCabe's Motion (ECF No. 35) and Defendant Boyle's Request for a Bill of Particulars are **DENIED**; Defendant McCabe's Motion *in Limine* to Exclude Evidence at Trial (ECF No. 37) is **DENIED**; and Defendant Boyle's Motion to Sever (ECF No. 46) is **GRANTED**.

The parties are **ORDERED** to confer and to file a joint status report no later than seven days from the date of this Order advising the Court how these counts should be severed and defining the scope of the trial calendared to begin on May 27, 2020.

The Clerk is **REQUESTED** to forward a copy of this Order to defense counsel and the Assistant United States Attorney.

**IT IS SO ORDERED.**

Arenda L. Wright Allen
United States District Judge

March_____, 2020
Norfolk, Virginia

48